[No. G027368. Fourth Dist., Div. Three. Apr. 24, 2002.]

KIMBERLY COLAROSSI, Plaintiff and Appellant, v.
COTY US INC., Defendant and Respondent.

1144

**COUNSEL**

Stanton T. Mathews & Associates and Ronald B. Funk for Plaintiff and Appellant.

Oppenheimer Wolff & Donnelly, Paul C. Nyquist and Grace Y. Horoupian for Defendant and Respondent.

**OPINION**

**BEDSWORTH, J.**—Kimberly Colarossi appeals from a summary judgment in favor of Coty US Inc. (Coty) on her claim for wrongful termination in violation of public policy. She contends the court improperly weighed the evidence in reaching its decision. She also contends the court erroneously' excluded highly relevant evidence, which, along with the other evidence she presented, is sufficient to create a triable issue of fact as to why she was terminated. Although we find Colarossi's first contention unmeritorious, we agree with her second one. Because the evidence would allow a reasonable trier of fact to find Colarossi was wrongfully terminated, we reverse the judgment.

Coty is a leading manufacturer and marketer of perfume. In 1987, Colarossi joined the company as a merchandising specialist. Her job was to visit retailers and make sure Coty's products were being promoted and displayed properly. By all accounts, Colarossi was an exceptional employee. In fact, in 1997 she was named Coty's top merchandiser in the entire nation. Deborah Bassett, the director of merchandising, personally selected Colarossi for this prestigious award.

A short time later, in May of 1997, Colarossi's supervisor, DeAnna Roe, accused Bassett of sexual harassment. Because Roe named Colarossi as one of the witnesses to the alleged harassment, the company sought to interview Colarossi as part of its investigation into the matter. After being assured her statements would remain confidential, Colarossi disclosed to an investigator that she had witnessed Bassett engage in what she considered to be sexually

inappropriate behavior. Other employees who were interviewed made similar disclosures.

The investigation culminated with Bassett being reprimanded for her conduct. However, the company took no other action against her. Roe, on the other hand, was told she would have to transfer to another state if she wanted to keep her job. She chose to resign instead.

Before leaving the company in September 1997, Roe had a conversation with fellow employee Frank Murdocco. According to Roe, he told her he had heard Bassett say she was "going to get revenge" on everyone who cooperated in the investigation. When asked at his deposition if he had ever made such a statement, Murdocco said no. In her deposition, Bassett also denied making any such statement. She claimed she did not even know who participated in the investigation, let alone what they said about her.

Upon Roe's departure, Mary Zabel became Colarossi's interim supervisor. On various occasions during the fall of 1997, Zabel discussed Coty's record-keeping policies with Colarossi. She told Colarossi that pursuant to company policy, her weekly reports had to contain legible signatures from the supervisors of the stores she serviced, and she had to keep better track of her hours. Zabel also made it clear that these policies were "not open to flexibility."

During this period, Bassett interviewed several people to fill Roe's position on a permanent basis. She spoke with Colarossi about the position, but she ended up giving the job to Dawn Miranda-Nesbitt because she felt she was the most qualified candidate. That made Miranda-Nesbitt Colarossi's new supervisor.

It wasn't long before the two came to loggerheads. In February 1998, Miranda-Nesbitt reviewed Colarossi's weekly reports and became suspicious that Colarossi was not working as much as she claimed. She felt Colarossi's reports contained incomplete information and some of the signatures from her store supervisors appeared to be fraudulent. Miranda-Nesbitt promptly reported this to Bassett, who instructed her to audit Colarossi's stores. The audit indicated that Colarossi was not keeping an accurate account of her hours and that she had falsified some of the supervisors' signatures.

When Miranda-Nesbitt met with Colarossi to discuss this, she denied any wrongdoing. Miranda-Nesbitt then scheduled a follow-up meeting so they could go over her findings more thoroughly. Colarossi did not show up for the meeting because she thought it would be humiliating. In her deposition,

she admitted she did not pay much attention to the reports and she sometimes forged the supervisors' signatures for the sake of expediency. Although she knew this was a violation of company policy, she did not think it important because Roe and other supervisors encouraged her to do so, and other merchandisers did it too. As for her work habits, Colarossi stated she put in very long hours and took great pride in her job. She felt that as long as she was doing her job, she did not have to worry about her weekly reports.

She was wrong. When Miranda-Nesbitt informed Bassett of Colarossi's recordkeeping deficiencies, Bassett immediately took them up with senior vice-president James McDougald. Although McDougald considered Colarossi to be an "excellent employee," he ordered her to be fired because she was not following the company's record-keeping policies.

Of the 10 other employees who participated in the investigation into Bassett's alleged sexual harassment, two have quit, one was terminated for falsifying her reports and the rest still work for the company. In the past, Coty has not always terminated those employees who have engaged in fraud. Some employees who falsified their reports were merely put on probation, a sanction that is expressly contemplated in the company handbook for this type of misconduct.

Following her dismissal, Colarossi sued Coty for wrongful termination in violation of public policy.[1] She alleged that Bassett had her fired for cooperating in the sexual harassment investigation and that her record-keeping deficiencies were merely a pretext for letting her go. Coty denied this and moved for summary judgment based on lack of proof. It also objected on hearsay grounds to Roe's allegation that Bassett threatened to get revenge on those who participated in the investigation. The court sustained the objection and found Colarossi's remaining evidence insufficient to justify her claim of retaliation. It stated, "The basic thing is this: Coty had good cause to terminate this employee. She lied . . . on the report she was supposed to submit, then tried to cover it up. Balanced against that . . . [there] just [is not] any evidence [of retaliation]. There is really no evidence . . . of any weight that Bassett even knew that Colarossi had participated in that investigation." The court therefore granted summary judgment for Coty.

I

Colarossi contends the court misunderstood its role in assessing Coty's motion. Instead of determining whether there were any triable issues of fact, Colarossi maintains the court assumed the role of fact finder and

[1]She also alleged five other causes of action, none of which are germane to this appeal.

decided the motion based on the relative strength of the parties' evidence. We disagree.

■ A party may move for summary judgment "if it is contended that the action has no merit or that there is no defense to the action or proceeding." (Code Civ. Proc., § 437c, subd. (a).) "[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [26 Cal.4th 80a, 107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted.) If the moving party carries this burden, "the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.) In making this determination "the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, [but] it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact.*" (*Id.* at p. 856, fn. omitted.) The motion should be granted only if the movant "would prevail at trial without submission of any issue of material fact to a trier of fact for determination . . . ." (*Id.* at p. 855.)

■ Seizing on the court's use of the words "balanced" and "weight" in its ruling, Colarossi contends the court improperly weighed the evidence in reaching its decision. However, it does not seem the court actually weighed Colarossi's evidence against that put forth by Coty. Rather, it simply determined that Colarossi's evidence fell short of proving that Coty's proffered reason for firing her was pretextual. In so doing, the court properly fulfilled its duty to determine what Colarossi's evidence could prove to a reasonable trier of fact. It does not appear to us to have overstepped its boundaries, as it would have had it assayed to weigh the evidence or resolve factual conflicts.

## II

■ Regardless of how the trial court reached its decision, it falls to us to examine the record de novo and independently determine whether that decision is correct. (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) And as part of that task, we must determine which information in the record to consider. ■ Although the trial court excluded Roe's statement about Bassett's alleged desire to seek

revenge on those that participated in the investigation, we agree with Colarossi that the trial court should have considered it in ruling on the motion.

As set forth in her declaration, Roe's statement was as follows: "After the investigation of the [sexual harassment] was complete, I had a conversation with Frank Murdocco, in which he said that he heard Debbie Bassett make a statement to the effect that she was going to get revenge on every one of the people on the list of those who gave statements during the investigation, referring to the list of witnesses interviewed."

Roe's statement contains two levels of information: (1) Bassett's statement to Murdocco, and (2) Murdocco's statement to Roe. The trial court treated both these statements as hearsay, but Bassett's statement has relevance apart from its substantive truth. Quite apart from the truth of the statement—i.e., that she *would* get revenge—the statement shows Bassett's mental state. It shows she felt she had been wronged and harbored ill will toward those she held responsible. "If an utterance, regardless of its truth or falsity, justifies an inference concerning the declarant's mental state (e.g., belief, intent, motive), it may be admissible as *circumstantial evidence* of that mental state. [Citations.]" (1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 37, p. 719.) Because Bassett's statement to Murdocco reflects her feelings and beliefs about Colarossi and others, it would be admissible for that nonhearsay purpose. (See *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 [44 Cal.Rptr.2d 914].)

Moreover, the hearsay rule does not prevent the admission of statements made by a party opponent. (See Evid. Code, § 1220.) Bassett was not actually named in the lawsuit, but she is the one who authorized the audit of Colarossi's stores, she is the one who oversaw the investigation into Colarossi's work habits, and she is the one who consulted with McDougald regarding Colarossi's fate with the company. In short, she was, as Miranda-Nesbitt put it, involved "each step of the way" in the process leading to Colarossi's termination. Such involvement renders her remark to Murdocco admissible as a statement of a party. (See *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 70 [105 Cal.Rptr.2d 652]; *E.E.O.C. v. Watergate at Landmark Condominium* (4th Cir. 1994) 24 F.3d 635, 638-640.)

■ There is another basis for admitting Bassett's statement that also applies with respect to Murdocco's statement, and that is the prior inconsistent statement exception to the hearsay rule set forth in Evidence Code section 1235. Pursuant to that section, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance

with Section 770." Evidence Code section 770 provides, "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

Coty concedes the statements attributed to Murdocco and Bassett by Roe are fundamentally inconsistent with their deposition testimony, thereby satisfying the core requirement of Evidence Code section 1235. Nonetheless, it contends the foundational requirements set forth in Evidence Code section 770 have not been met, insofar as Murdocco and Bassett were not given an opportunity in their depositions to explain or deny their statements, i.e., they were not asked when and where or to whom they were made. (See *People v. Garcia* (1990) 224 Cal.App.3d 297, 304 [273 Cal.Rptr. 666].) If this case goes to trial, Colarossi's attorney will surely have to ask these questions in order to get Murdocco's and Bassett's prior inconsistent statements admitted into evidence. (*Ibid.*) However, we cannot fathom any good reason why counsel would have to ask these questions at the discovery stage of the case.

The reason for allowing a witness to explain or deny an alleged prior inconsistent statement is to assist the *trier of fact* in assessing the witness's credibility. This procedure permits a full examination of the circumstances surrounding the earlier statement, which sets the stage for effective cross-examination. " 'The witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. The reasons for the change of face, whether forgetfulness, carelessness, pity, terror, or greed, may be explored by the two questioners in the presence of the trier of fact, under oath, casting light on which is the true story and which the false. . . .' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 953 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

This can only occur in the context of trial. Before that time, i.e., "before the inconsistent statement is introduced in evidence," there is "no compelling reason" to provide the witness with the opportunity to explain or deny his statements. (Cal. Law Rev. Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 770 p. 423, italics omitted.) Therefore, the trial court should have considered the hearsay statements contained in Roe's declaration in deciding the summary judgment motion.

### III

That brings us to the final issue: Including Roe's statement, was Colarossi's evidence sufficient to defeat Coty's motion for summary judgment? We believe that it was.

■ "To establish a prima facie case of retaliation, the plaintiff must show (1) he or she engaged in a protected activity; (2) the employer subjected the employee to an adverse employment action; and (3) there exists a causal link between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453 [116 Cal.Rptr.2d 602].)

■ With respect to Colarossi's attempt to establish a prima facie case of retaliation, the only disputed issue was causation, i.e., did she show a causal link between her participation in the sexual harassment investigation and her subsequent termination? At a minimum, this required Colarossi to present evidence that Bassett knew she participated in the investigation. (*Morgan v. Regents of University of California, supra,* 88 Cal.App.4th at p. 70.) Coty contends Colarossi failed to carry her burden in this regard, but we disagree.

Colarossi relied primarily on two pieces of evidence to show that Bassett knew she had participated in the investigation. The first was Bassett's statement that she intended to get revenge on those who participated in the investigation. Coty would have us believe this statement is meaningless because Bassett did not specifically identify any of the employees who participated in the investigation. However, according to Murdocco, Bassett was referring to a list of witnesses who had been interviewed. Since Colarossi had been interviewed, it is reasonable to presume that she was on the list and that Bassett knew of her participation. (See *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 854 [89 Cal.Rptr.2d 540] [in reviewing summary judgment "we must construe plaintiff's evidence liberally and accept all reasonable inferences which could be drawn by a trier of fact in favor of plaintiff"].)

Even without Bassett's statement, there was other evidence indicating Bassett knew of Colarossi's participation in the investigation. In her deposition, Colarossi stated that following the investigation, Bassett talked to her about certain information she had confidentially divulged to the investigators. While Bassett claimed that Colarossi had discussed this information with her before the investigation occurred, Colarossi disputed this. At the very least, this conflicting evidence created a triable issue of fact as to whether Bassett knew that Colarossi had participated in the investigation.

Therefore, summary judgment could not be granted on the basis that Bassett lacked knowledge of Colarossi's participation.

Still, Colarossi had to establish that her participation in the investigation was the reason she was fired. (See *Chen v. County of Orange* 96 Cal.App.4th 926 [116 Cal.Rptr.2d 786]) Certainly there can be no question that Coty presented a legitimate, nondiscriminatory reason for her discharge. As the trial court aptly noted, Colarossi's violation of the company's record-keeping policies provided Coty with a plausible justification for firing her. Thus, it was up to Colarossi to prove that this justification was merely a pretext to cover up Coty's discriminatory intent. She had to show she was a victim of unlawful retaliation. (See *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 153 [120 S.Ct. 2097, 2111-2112, 147 L.Ed.2d 105].)

■ Both direct and circumstantial evidence can be used to show an employer's intent to retaliate. "Direct evidence of retaliation may consist of remarks made by decisionmakers displaying a retaliatory motive. [Citation.]" (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 816 [89 Cal.Rptr.2d 505].) Circumstantial evidence typically relates to such factors as the plaintiff's job performance, the timing of events, and how the plaintiff was treated in comparison to other workers. (*Ibid.*; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479 [4 Cal.Rptr.2d 522].) Colarossi's evidence covered all of these bases.

■ The strongest piece of evidence in Colarossi's arsenal is no doubt Roe's declaration. It contains a veritable "smoking gun" in the form of Bassett's expressed desire to get revenge on the people who cooperated in the investigation into her alleged sexual harassment. Based on this expression alone, a trier of fact could logically find that Bassett intended to retaliate against Colarossi for participating in the investigation. (See *Merritt v. Dillard Paper Co.* (11th Cir. 1997) 120 F.3d 1181, 1189-1191 [supervisor's statement to employee that he would no longer have a place in the company due to his damning deposition testimony in a sexual harassment suit against the company constituted direct evidence of retaliation which, standing alone, was sufficient to preclude summary judgment]; *Veprinsky v. Fluor Daniel, Inc.* (7th Cir. 1996) 87 F.3d 881, 893 [giving similar effect to statement indicating plaintiff was not rehired because he was suing the company for religious discrimination].)

But Colarossi's case did not rest solely on Bassett's statement. She also presented circumstantial evidence that she was the victim of retaliation. In her deposition, she stated that before the investigation took place she had been a "top performer," received "numerous awards," and "never had a

negative thing said about [her]." Coty did not present any evidence to refute this. In fact, it is undisputed that Colarossi was named the company's best merchandiser in all the country shortly before the time Roe formally accused Bassett of sexual harassment.

After that, everything seemed to change for Colarossi. Instead of praising Colarossi for her fine work, Coty began scrutinizing her weekly reports with a skepticism previously reserved for the Shroud of Turin. Prior to that time, no one had ever questioned Colarossi's record-keeping habits. She says her supervisors either encouraged her to falsify her reports or looked the other way when she did. Consequently, Colarossi, like other merchandisers, treated the reports as a mere formality.

Of course that did not preclude Coty from taking steps to remedy this situation. It had every right to confront Colarossi about her reports and take steps to ensure that she complied with the company's record-keeping policies. However, its decision to take these actions on the heels of Colarossi's participation in the investigation might strike a trier of fact as being rather suspicious. The timing of the decision may have been coincidental, but when viewed as part of the mosaic of evidence Colarossi presented, it adds to the impression that Coty possessed a retaliatory motive, not a benign one. (See *Sims v. MME. Paulette Dry Cleaners* (S.D.N.Y. 1984) 580 F.Supp. 593, 598 [employer's sudden decision to strictly enforce work rules in wake in employee's discrimination complaint raises inference of retaliation].)

So does the fact some employees received greater leniency than Colarossi was afforded after they were found to have engaged in fraudulent behavior. While Colarossi and another employee who participated in the investigation were terminated for falsifying their reports, at least two other employees who did not participate in the investigation were merely put on probation for doing the same thing—a punishment delineated in the employee handbook. Coty is quick to point out that it has fired other workers in the past for violating its record-keeping policies. But that still does not explain why it chose to terminate Colarossi rather than give her probation. This question takes on added significance when Colarossi's vast experience and excellent work record are taken into consideration.

Coty would have us believe that other evidence in the case proves its motives were pure. It interprets Bassett's decision to interview Colarossi for Roe's position as a sign that Bassett harbored no ill feelings towards her. But the fact is, Bassett ended up giving the job to Miranda-Nesbitt, who worked closely with Bassett in digging up Colarossi's record-keeping deficiencies. Looking at the big picture, it is easy to see how a trier of fact might doubt

Bassett had Colarossi's best interests in mind in carrying out her personnel decisions.

Coty also draws our attention to the statistical evidence, but the numbers do not lend credence to its position either. Granted, seven of the eleven employees who participated in the investigation still work for the company. One of them was even promoted. However, four of the workers, over a third of the group, were either fired or have moved on to other jobs. When we factor in the evidence indicating that Roe was forced out of the company, the numbers do not cast a particularly favorable light on Coty's actions.

We are fully aware that Colarossi engaged in fraudulent conduct in violation of Coty's record-keeping policies. And we certainly do not intend by anything we say to question an employer's right to terminate on this basis. It may well be determined that Coty's actions were justified and appropriate. But, considering the totality of the evidence, we believe a rational trier of fact could reasonably conclude that Coty was motivated by retaliatory motives. The fact there is evidence which would support either conclusion convinces us the trial court erred in granting summary judgment on Colarossi's claim for wrongful termination in violation of public policy.[2]

The judgment is reversed. Coty is ordered to pay Colarossi's costs on appeal.

Sills, P. J., and Rylaarsdam, J., concurred.

---

[2]In light of this disposition, we need not address Colarossi's remaining claim that the trial court erred in denying her request for a continuance or a new trial based on newly discovered evidence.