[No. G027107. Fourth Dist., Div. Three. May 29, 2002.]

YVONNA K. RAY, Individually and as Administrator, etc., et al.,
Plaintiffs and Appellants, v.
SILVERADO CONSTRUCTORS et al., Defendants and Respondents.

**COUNSEL**

Stolpman, Krissman, Elber & Silver, Donna Silver and Joel Krissman for Plaintiffs and Appellants.

Schaffer & Lax, Clifford L. Schaffer, Michael M. Walsh; Schaffer, Lax, McNaughton & Chen, Michael M. Walsh, David R. Highman; Highman, Fuller, Brown & Corrado and David R. Highman for Defendants and Respondents.

## OPINION

**MOORE, J.**—An employee of an independent contractor was killed when construction materials blew off a bridge in high winds and struck him in the back of the head. In the ensuing litigation, the owner of the project and the general contractor moved for summary judgment, contending there was no basis for liability as a matter of law, under the rationale of *Privette v. Superior Court* (1993) 5 Cal.4th 689 [21 Cal.Rptr.2d 72, 854 P.2d 721] and *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253 [74 Cal.Rptr.2d 878, 955 P.2d 504]. The trial court agreed and granted summary judgment.

Appellants contend the trial court erred because, as recently made clear in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 [115 Cal.Rptr.2d 853, 38 P.3d 1081],[1] the *Privette/Toland* rationale leaves room for a cause of action against a property owner or a general contractor based on a theory of direct negligence. Appellants further explain that, under the circumstances, the project owner and the general contractor had a duty to close the road on which the decedent was killed and had they only done so, the accident would not have occurred. We agree that the *Privette/Toland* rationale does not preclude all theories of liability under the particular circumstances of this case. Moreover, appellants raised triable issues of material fact as to duty, breach of duty and causation. It was error to grant summary judgment, and we reverse.

### I

### FACTS

The unfortunate turn of events arose out of work on a highway construction project known as the Eastern Transportation Corridor. At the time of the accident, the Foothill/Eastern Transportation Corridor Agency (TCA), a joint powers agency whose member agencies include 11 cities and one county, was the owner of the project. Silverado Constructors (Silverado) was the general contractor. The segment of the project in question required the construction of more than a dozen connector bridges. Silverado subcontracted construction of several of the bridges to Steve P. Rados, Inc. (Rados).

---

[1] Since the parties filed their original briefs, the California Supreme Court has decided several relevant cases. Accordingly, we requested supplemental briefing on *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219 [115 Cal.Rptr.2d 868, 38 P.3d 1094], *Hooker v. Department of Transportation, supra,* 27 Cal.4th 198, *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235 [108 Cal.Rptr.2d 617, 25 P.3d 1096], *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 [26 Cal.4th 80a, 107 Cal.Rptr.2d 841, 24 P.3d 493], and *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].

The decedent, Michael Ray, was a Rados foreman. On the day of his death, high winds had kicked up. The winds were so severe that they had started blowing extremely weighty construction materials off one of the bridges onto the roadway below, known as Marine Way. Ted Kearney, another Rados foreman who oversaw the work on the bridge in question, directed his men to shut down operations and secure the materials on the bridge. Two Rados employees began securing materials that had been blown off the bridge already.

The decedent left his work location, at a different bridge, and was headed towards construction headquarters. En route, he was traveling on Marine Way, which runs underneath the bridge where Kearney's crew was working. The decedent stopped his truck so as to block traffic on Marine Way, turned on his flashing beacon, got out of his truck, and began assisting the other two Rados employees in securing the materials that had been blown off the bridge. After clearing debris from traffic lanes, he was hit in the back of the head with a wood deck form weighing more than 200 pounds.

The decedent's wife (Appellant), in her individual capacity, as well as in her capacities as administrator of the decedent's estate and guardian ad litem of their two minor children, filed suit against TCA and Silverado. In her first amended complaint, she asserted, inter alia, that TCA and Silverado were actively negligent in failing to carry out their duties of care for the work site, which included the public road.

TCA and Silverado responded with a motion for summary judgment. They asserted there was no basis for liability as a matter of law, under the rationale of *Privette v. Superior Court, supra,* 5 Cal.4th 689 and *Toland v. Sunland Housing Group, Inc., supra,* 18 Cal.4th 253. They interpreted those cases to mean that neither a property owner nor a general contractor is responsible for injuries to an independent contractor's employee resulting from the independent contractor's activities, when workers' compensation coverage is available. As TCA and Silverado saw it, the decedent was a Rados employee killed on the job while securing Rados construction materials. From their viewpoint, this was determinative.

Appellant opposed the motion, arguing TCA and Silverado presented an overly narrow reading of *Privette* and *Toland.* Appellant urged those cases apply when the independent contractor is negligent and the plaintiff seeks to impose vicarious liability on the defendants. She further argued the cases are inapposite when, as here, the plaintiff does not allege the independent contractor was negligent, but does claim the general contractor was actively negligent, giving rise to direct, not vicarious, liability. She asserted TCA and

Silverado had duties to all persons using Marine Way, both members of the general public and construction workers, to close the roadway when a risk of harm arose due to falling construction materials. Had the road only been closed, the decedent never would have arrived at the accident site, and never would have been killed.

The trial court concluded the obvious cause of death was falling wood, nothing else. Moreover, it indicated that since the decedent was killed while on the job and a successful workers' compensation claim had been made, *Privette* and *Toland* barred an action against TCA and Silverado. Appellant filed her appeal.

## II

### DISCUSSION

#### A. *Privette/Toland Rationale*

##### (1) *Recent Decisions*

The California Supreme Court recently revisited the *Privette/Toland* rationale in a trilogy of decisions: *McKown v. Wal-Mart Stores, Inc., supra,* 27 Cal.4th 219; *Hooker v. Department of Transportation, supra,* 27 Cal.4th 198; and *Camargo v. Tjaarda Dairy, supra,* 25 Cal.4th 1235. In *Hooker* and *Camargo,* the court reiterated its summary, as expressed in *Toland,* of the peculiar risk doctrine in the context of a hired contractor's injured employee. It stated: " 'Under the doctrine of peculiar risk, a person who hires an independent contractor to do inherently dangerous work can be held liable for tort damages when the contractor causes injury to others by negligently performing the work. The doctrine serves to ensure that innocent bystanders or neighboring landowners injured by the hired contractor's negligence will have a source of compensation even if the contractor turns out to be insolvent. . . . [C]ourts created the peculiar risk doctrine in the belief that "as between two parties innocent of any personal wrongdoing—the person who contracted for the work and the hapless victim of the contractor's negligence—the risk of loss occasioned by the contracted work was more fairly allocated to the person for whose benefit the job was undertaken." [¶] In *Privette* . . . , we unanimously held that under the peculiar risk doctrine the hiring person's liability does not extend to the hired contractor's employees. Because the Workers' Compensation Act (Lab. Code, § 3200 et seq.) shields an independent contractor from tort liability to its employees, applying the peculiar risk doctrine to the independent contractor's employees would illogically and unfairly subject the hiring person, who did nothing to

create the risk that caused the injury, to greater liability than that faced by the independent contractor whose negligence caused the employee's injury. [Citation.] As we concluded: "[T]he property owner should not have to pay for injuries caused by the contractor's negligent performance of the work when workers' compensation statutes already cover those injuries." [Citation.]' [Citation.]" (*Hooker v. Department of Transportation, supra,* 27 Cal.4th at p. 204; *Camargo v. Tjaarda Dairy, supra,* 25 Cal.4th at pp. 1238-1239.)

In this summary of the *Privette/Toland* rationale, the court mentioned the independent contractor's negligence five times and the hiring party's innocence twice. This was quite significant, as the *Camargo, Hooker* and *McKown* cases went on to make clear.

In the first case in the trilogy, *Camargo,* the court held the *Privette/Toland* rationale barred a negligent hiring action against the hirer of an independent contractor whose employee was killed on the job. (*Camargo v. Tjaarda Dairy, supra,* 25 Cal.4th at p. 1238.) In reaching its decision, the court used the following language: "[A]s we explained in *Toland,* the rationale of our decision in *Privette* extends to cases where the hirer is *directly* negligent in the sense of having failed to take precautions against the peculiar risks involved in the work entrusted to the contractor. To repeat: In *Toland,* we rejected the plaintiff's argument that *Privette* did not bar recovery for direct liability under [Restatement Second of Torts,] section 413, but only for vicarious liability under [Restatement Second of Torts,] section 416." (*Id.* at pp. 1243-1244.) The court went on to explain that the liability under Restatement Second Torts, section 413, though perhaps "direct" liability in a certain sense, was in essence "derivative" liability, just like the theory of "vicarious" liability on which section 416 rests. It stated that under section 413, "the liability of the hirer is 'in essence "vicarious" or "derivative" in the sense that it derives from the "act or omission" of the hired contractor, because it is the hired contractor who caused the injury . . . .' [Citation.]" (*Camargo,* at p. 1244.)

The court in *Camargo* concluded "an employee of a contractor should be barred from seeking recovery from the hirer under the theory of negligent hiring . . . ." (*Camargo v. Tjaarda Dairy, supra,* 25 Cal.4th at p. 1244.) This was because the negligent hiring theory, while to a certain extent based on an assertion of "direct" liability stemming out of the hiring party's own negligence in selecting the contractor, was in actuality predicated on derivative liability because the hired contractor was the one who caused the injury. (*Ibid.*) The court once again mentioned the fault of the hired contractor.

In the second case, *Hooker,* the court addressed "whether an employee of a contractor may sue the hirer of a contractor for the tort of *negligent*

*exercise of retained control . . . .*" (*Hooker v. Department of Transportation, supra*, 27 Cal.4th at p. 201, fn. omitted.) The decedent in *Hooker* was an employee of a general contractor the California Department of Transportation (Caltrans) had hired to construct an overpass. The decedent operated a crane with outriggers. When fully extended, the outriggers covered all but seven feet of the width of the overpass. The decedent had the habit of retracting the outriggers to allow construction and other vehicles to pass. On one occasion, he retracted the outriggers and left the crane. When he came back, he attempted to swing the boom without first reextending the outriggers. The crane toppled due to the weight of the boom and the decedent was killed.

Caltrans was sued on the theory it had negligently exercised its retained control over worksite safety conditions. After a lengthy analysis, the Court concluded that "if a hirer does retain control over safety conditions at a worksite and negligently exercises that control in a manner that affirmatively contributes to an employee's injuries, it is only fair to impose liability on the hirer." (*Hooker v. Department of Transportation*, supra, 27 Cal.4th at p. 213.) In other words, the court made clear that a direct negligence cause of action against a hirer was viable following the decisions in *Privette* and *Toland*. In the case before it, however, the court concluded that summary judgment in favor of Caltrans, the hirer, was proper. (*Id.* at p. 202.) While the plaintiff had raised triable issues of material fact as to whether Caltrans had retained control over work site safety conditions, she had failed to raise a triable issue of material fact as to whether Caltrans had actually exercised the retained control so as to affirmatively contribute to the death of her husband. (*Ibid.*)

In *McKown*, the final case in the trilogy, the court considered "whether, under [the] decisions in *Privette* and *Toland*, an employee of an independent contractor is barred from pursuing a lawsuit against the hirer of the independent contractor on the theory the hirer negligently provided unsafe equipment." (*McKown v. Wal-Mart Stores, Inc., supra*, 27 Cal.4th at p. 223.) The court answered that question in the negative and affirmed the decision of the appellate court holding a hirer liable for negligently providing an unsafe forklift for use by an independent contractor on the hirer's premises. Citing the reasoning of *Hooker*, the court in *McKown* summed up by stating: "Imposing tort liability on a hirer of an independent contractor when the hirer's conduct has affirmatively contributed to the injuries of the contractor's employee is consistent with the rationale of our decisions in *Privette, Toland* and *Camargo*, because the liability of the hirer in such a case is *not* in essence *vicarious* or *derivative* in the sense that it derives from the act or omission of the hired contractor. . . . [¶] For the same reason, when a hirer of an independent contractor, by negligently furnishing unsafe equipment to

the contractor, affirmatively contributes to the injury of an employee of the contractor, the hirer should be liable to the employee for the consequences of the hirer's own negligence." (*Id.* at p. 225.) With this decision, the court eliminated any doubt that a direct negligence cause of action may be maintained against the hirer of an independent contractor without running afoul of *Privette* and *Toland.*

#### (2) *Application*

Nonetheless, TCA and Silverado contend *Camargo, Hooker* and *McKown* support the assertion they cannot be held liable. As they see it, any potential liability in this case is vicarious only. They reiterate that Rados had control of its own construction site and was responsible for retrieving the construction materials it had failed to adequately secure on the bridge. They assert the injury was caused by Rados's own activities in that regard and they had nothing to do with it. But we cannot ignore Appellant's claim that, separate and apart from any duty Rados had to retrieve construction materials (preferably when safe to do so), TCA and Silverado each had an independent duty to block the roadway so as to bar persons from crossing under the bridge when there was a risk of harm. She clearly asserts a direct liability claim.

TCA and Silverado disagree. As they see it, Appellant has never alleged that either TCA or Silverado engaged in any "affirmative act" which contributed to the accident. They contend *Hooker* establishes a narrow exception to the *Privette/Toland* rationale, one which provides a suit may be successfully maintained against the hirer only if the hirer has performed an "affirmative act" causing the injury. We do not share their view.

The court in *Hooker* reasoned as follows: "[I]f an employee of an independent contractor can show that the hirer of the contractor affirmatively contributed to the employee's injuries, then permitting the employee to sue the hirer for negligent exercise of retained control cannot be said to give the employee an unwarranted windfall. The tort liability of the hirer is warranted by the hirer's own affirmative conduct. The rule of workers' compensation exclusivity 'does not preclude the employee from suing anyone else whose conduct was a proximate cause of the injury' (*Privette, supra,* 5 Cal.4th at p. 697), and when affirmative conduct by the hirer of a contractor is a proximate cause contributing to the injuries of an employee of a contractor, the employee should not be precluded from suing the hirer." (*Hooker v. Department of Transportation, supra,* 27 Cal.4th at p. 214, italics omitted.)

TCA and Silverado fixate on the words "affirmative conduct" and discount the words "affirmatively contributed." They do so despite the fact the

court in *Hooker* made clear that an affirmative contribution is what is key. The court explained that an "affirmative contribution need not always be in the form of actively directing a contractor or contractor's employee. There will be times when a hirer will be liable for its omissions. For example, if the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury." (*Hooker v. Department of Transportation, supra,* 27 Cal.4th at p. 212, fn. 3; see also *McKown v. Wal-Mart Stores, Inc., supra,* 27 Cal.4th at p. 222 [hirer liable to employee of independent contractor insofar as hirer "affirmatively contributes" to employee's injury].)

TCA and Silverado argue that Appellant has not identified any safety measure they failed to undertake and that having retained control over worksite conditions is an insufficient basis for liability. But Appellant cites traffic safety as the obligation they failed to fulfill. She is not alleging TCA and Silverado failed to exercise control over safety procedures on the bridge where Rados employees were working. Rather, Appellant contends TCA and Silverado failed to discharge their distinct obligation to make roadways safe for all motorists.

■ Given the recent decisions in *Camargo, Hooker* and *McKown,* it is clear the *Privette/Toland* rationale does not bar all direct liability actions filed by injured employees of independent contractors against property owners and general contractors. Appellant has framed a cause of action based on direct liability, not vicarious liability. That being so, it was error to grant summary judgment on the basis the *Privette/Toland* rationale precludes Appellant's action against TCA and Silverado as a matter of law.

B. *Summary Judgment*

(1) *In General*

The California Supreme Court has also been quite active lately in providing us with guidance on summary judgment law. Indeed, it set forth comprehensive guidelines in its recent decision in *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th 826. ■ As the court stated therein, "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Id.* at p. 843.) "Under summary judgment law, any party to an action, whether plaintiff or defendant, 'may move' the court 'for summary judgment' in his [or her] favor on a cause of action . . . or defense (Code Civ. Proc., § 437c, subd. (a))—a plaintiff 'contend[ing] . . . that there is no

defense to the action,' a defendant 'contend[ing] that the action has no merit' (*ibid.*). The court must 'grant[]' the 'motion' 'if all the papers submitted show' that 'there is no triable issue as to any material fact' (id., § 437c, subd. (c))—that is, there is no issue requiring a trial as to any fact that is necessary under the pleadings and, ultimately, the law [citations]—and that the 'moving party is entitled to a judgment as a matter of law' (Code Civ. Proc., § 437c, subd. (c))." (*Ibid.*)

### (2) *Burden of Persuasion*

■ "[I]n moving for summary judgment, a 'defendant . . . has met' his [or her] 'burden of showing that a cause of action has no merit if' he [or she] 'has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. . . .' (Code Civ. Proc., § 437c, subd. (o)(2).)" (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 849.)

In this case, TCA and Silverado, as the moving defendants, attempted to show they had a complete defense to Appellant's causes of action, i.e., that the *Privette/Toland* rationale barred Appellant's causes of action as a matter of law. The trial court agreed, and rested its judgment largely on this point. The trial court concluded that TCA and Silverado had met their burden to show a complete defense and that the burden had then shifted to Appellant to show a triable issue of one or more material facts. The court considered Appellant's argument that TCA and Silverado had duties of care with respect to safety and traffic control on Marine Way and that the failure to fulfill those duties was the cause of death. The court dismissed these arguments with little analysis, however, stating merely that the decedent "was not injured by the street or by the traffic, but by the unsecured piece of *wood* that struck him from above."

We disagree with the court's analysis for two reasons. First, as explained above, *Privette* and *Toland* are not properly construed to mean a cause of action for direct negligence can never be maintained against the property owner and general contractor. Thus, to the extent TCA and Silverado based their motion on those cases, they fell short of meeting their burden of showing a complete defense. Second, to the extent their motion is based on the assertions that they had no duty of care, they did not breach any duty, or causation was lacking, Appellant succeeded in raising triable issues of material fact as to each point. (See *Saelzler v. Advanced Group 400, supra,* 25 Cal.4th 763, 767 [wherein plaintiff raised triable issues as to duty and breach of duty, but failed to raise a triable issue as to causation].)

### (3) *Triable Issues re Duty*

#### (a) *Allegations*

■ In the first amended complaint, the Appellant phrased her allegations broadly. She stated, among other things, TCA and Silverado were "actively negligent" in failing to fulfill both contractual requirements and "duties of care for the work site, which included the public road." In response to this broad assertion of liability, TCA and Silverado filed a motion for summary judgment contending that under *Privette* and *Toland* they had no vicarious liability for the acts of Rados. They also mentioned that they simply had no independent duty to Appellant under California law, implying they could have no direct liability either.

In her opposition to the motion for summary judgment, Appellant countered that the accident was not due to any fault of Rados and that Silverado and TCA each had independent bases for liability. She argued Silverado was directly negligent for failing to fulfill its duty to barricade Marine Way, in order to protect persons traveling thereon against the hazards presented by construction materials blown off the overpass above. She contended the duty was based on contract, case law and certain statutory and regulatory provisions. Appellant also maintained TCA, as the owner of the project and the agent of Caltrans, had a concurrent duty to protect persons on the roadway. She indicated TCA's duties derived from its contract with Caltrans and from statutory and common law. She also asserted TCA was liable for the omissions of Silverado, its agent.

#### (b) *Contract documents*

A brief overview of the three contracts involved may be helpful to an understanding of the relationship between the various parties as well as their respective obligations in connection with the construction project. The first contract was between TCA and Caltrans. It was a "Cooperative Agreement" for TCA's construction of certain proposed state highways. In that contract, TCA agreed to "take all necessary precautions to protect the traveling public from injury and damage related to the operation of [its] vehicles, the Construction Contractor's equipment and vehicles, and vehicles of other contractors and consultants retained by [TCA]." The Cooperative Agreement provided the project would be designed and constructed pursuant to TCA's "Design/Build Contract" with Silverado.

In the Design/Build Contract, TCA and Silverado described the project as "approximately 25 miles of limited access divided highway and related

structures, equipment and systems." The parties anticipated that the project would ultimately be conveyed to Caltrans. The Design/Build Contract contained numerous provisions concerning Silverado's safety obligations. It imposed general safety obligations on Silverado, as well as specific traffic safety obligations. The contract obligated Silverado to: "(a) comply with all applicable [g]overnmental [r]ules regarding closing or restricting the use of public streets or highways, (b) conduct the [w]ork so as to assure the least possible obstruction to traffic both within and outside of the [s]ite, and (c) protect all obstructions adjacent to or within traveled roadways by installing approved signs, barricades, lights and other protective devices where necessary for the safety of the public." In order to fulfill these obligations, Silverado had several traffic control crews that it used to close roadways from time to time.

The Design/Build Contract also required Silverado to ensure that all personnel, including subcontractors, comply with all traffic control requirements while on site and to compel anyone not complying with traffic control requirements to leave the site. In addition, it required Silverado to furnish and implement construction staging/traffic handling plans. Silverado also agreed to submit these plans to Caltrans and/or affected local agencies for approval and to provide copies of the plans to TCA within two business days after approval.

Silverado, in turn, entered into a subcontract with Rados. Silverado subcontracted only a portion of the project, the construction of several connector bridges, to Rados. Silverado retained the obligation to construct about four of the bridges itself, and to oversee construction procedures and site safety for the entire project.

As TCA and Silverado oft point out, the subcontract required Rados to provide all labor and materials necessary for its portion of the project. In addition, the subcontract made Rados solely responsible for the safety of its employees and other persons who were in the area where Rados was working. But they ignore the subcontract provisions concerning traffic barricades.

The subcontract required Silverado to supply a limited amount of equipment to enable Rados itself to close roadways, and gave Silverado the discretion to provide California Highway Patrol officers to Rados for road closure purposes as well. However, the critical provision of the subcontract prohibited Rados from erecting any barricades without the advance written permission of Silverado. Silverado, in turn, would contact the city in which the roadway was located so that police and fire personnel would be aware of

the situation. In practice, Rados contacted Silverado 48 hours in advance of any need to close a roadway. This subcontract provision requiring written permission for roadway closure provides a major underpinning for Appellant's assertion Silverado retained control over the roadway closure and was the party responsible for barricading the roadway under the exigent circumstances that arose on the morning of the decedent's death.

TCA and Silverado attempt to diminish the significance of these contracts. They argue the contracts create no duty in favor of the decedent for several reasons. First, they state that nothing in the Cooperative Agreement usurps the authority of Rados over its own personnel and operations or makes TCA responsible for the safety of the workers. Second, they point out that the Design/Build Contract specifically states that no term thereof shall be construed to create any third party beneficiary, but rather, "[t]he duties, obligations and responsibilities of the parties . . . with respect to such third parties shall remain as imposed by law." In addition, they contend case law has already established that the presence of a contract provision delegating the owner's safety responsibilities to the general contractor does not create a duty of care upon the general contractor toward the subcontractor's injured employee, citing *Zamudio v. City and County of San Francisco* (1999) 70 Cal.App.4th 445, 453 [82 Cal.Rptr.2d 664].

Assuming, without deciding, the Design/Build Contract provision served to negate any third party beneficiary status, it nonetheless provided duties with respect to third parties would remain as imposed by law. As we shall show, the law may indeed impose duties towards third parties in this context. Moreover, the case upon which TCA and Silverado rely, *Zamudio*, did not involve a context, such as the one before us, where a party had retained control over a particular facet of safety operations, i.e., traffic control. It did not address a situation where a subcontract prohibited the independent contractor from undertaking certain safety measures without the prior written consent of the general contractor. TCA and Silverado not only ignore the distinction, they ignore the entire subcontract provision.

(c) *Retained control*

While omitting to discuss the subcontract provision giving rise to the theory of retained control, TCA and Silverado nevertheless argue strongly against application of a retained control theory to the case, post *Hooker*. They assert *Hooker* is quite similar factually to the case before us and dictates the same result—summary judgment. They remind us that, in *Hooker*, Caltrans had retained authority over safety procedures and traffic management at the construction site and had observed the decedent's practice of retracting the outriggers to let vehicles pass. Nonetheless, Caltrans

did not insert itself into the situation to put a halt to the practice. Summary judgment was upheld despite Caltrans's general authority or control over safety conditions. As TCA and Silverado interpret the decision, general authority or control is insufficient. Rather, they claim a defendant may be liable only when having failed to undertake a "particular" safety measure as promised. They imply Silverado never promised to barricade the roadway and therefore cannot be liable under *Hooker*.

Yet they fail to observe that *Hooker* is distinguishable from the case before us on the same basis as is *Zamudio*. *Hooker* did not involve a situation where the independent contractor was barred from undertaking enumerated safety measures without the prior written consent of the general contractor, and, implicitly, the consent of the applicable public agencies with which the general contractor communicated concerning the independent contractor's request. Here, TCA and Silverado make no assertion that Rados had, fortuitously, obtained prior written permission to close Marine Way on the morning in question. Therefore, we assume Rados had not done so and was contractually restrained from barricading the roadway. If this is correct, it would appear Silverado was the party empowered by contract to close Marine Way at the critical time. This looks like retained control.

### (d) *Duties of highway contractor and owner*

Still, the various contracts are not the only proffered bases for imposing duty on Silverado and TCA. In her opposition to the motion for summary judgment, Appellant cited *Breslin v. Fredrickson* (1957) 152 Cal.App.2d 780 [313 P.2d 597], which she cites again on appeal. As the court in *Breslin* explained: " 'A highway contractor doing work on a public highway or street owes to the traveling public the duty of protecting it from injury that may result from his negligence. He is under a duty, for instance, to warn travelers of existing hazards during the construction period by the placing of lights, guards, warning signs, and barriers. . . .' [Citation.]" (*Id.* at p. 786; see also *Thirion v. Fredrickson & Watson Constr. Co.* (1961) 193 Cal.App.2d 299, 304-305 [14 Cal.Rptr. 269].) The court made plain this duty applies even when the contractor has performed his work properly and the hazard is created by conditions immediately adjacent to the roadway upon which the contractor worked. (*Breslin v. Fredrickson, supra,* 152 Cal.App.2d at p. 786.) It stated: "The contractor's responsibility [is] not limited to dangerous conditions within the scope of his own work while he [is] in control of the job site. He [is] under a duty to protect the public against dangerous conditions existing where the public in rightful use of the roadway might encounter such conditions." (*Ibid.*)

As *Breslin* shows, Silverado, the general contractor doing work on the Eastern Transportation Corridor project, owed a duty to the traveling public

to protect it from injury on the roadways comprising the overall 25-mile project. The fact the construction activities of Rados may have affected safety conditions on Marine Way did not necessarily mean all of Silverado's obligations to make the roadway safe evaporated.

At the trial level, TCA and Silverado noted *Breslin* was factually distinguishable, because it did not involve injury to an employee of an independent contractor. They did not see the relevance of the case in terms of establishing a duty to make a roadway safe, even when the danger is caused by the construction operations of another. On appeal, TCA and Silverado simply do not respond to *Breslin* at all. They do not mention whether there is a reason why Silverado's safety obligations should not have extended to Marine Way, other than to imply that Rados's nearby construction activities somehow absolved Silverado of its safety obligations over the roadway.

TCA and Silverado also overlook Appellant's citation, both in her opposition to the motion for summary judgment and on appeal, to Vehicle Code section 21367. Subdivision (a) of that statute provides that "the duly authorized representative of the Department of Transportation or local authorities, with respect to highways under their respective jurisdictions, including, but not limited to, persons contracting to perform construction, maintenance, or repair of a highway, may, with the approval of the department or local authority, as the case may be, and while engaged in the performance of that work, restrict the use of, and regulate the movement of traffic through or around, the affected area whenever . . . the work would interfere with or endanger the movement of traffic through the area. Traffic may be regulated by warning signs, lights, appropriate control devices, or by a person or persons controlling and directing the flow of traffic." (Veh. Code, § 21367, subd. (a).) TCA and Silverado do not address whether this provision may have created a duty upon them to barricade Marine Way in order to ensure the safety of the traveling public. (Cf. *Tankersley v. Low & Watson Constr. Co.* (1959) 166 Cal.App.2d 815, 820 [333 P.2d 765] [the purpose of Sts. & Hy. Code, § 125, permitting Caltrans to place barricades and warning devices on highways, "is to require that warnings be given to traffic moving upon a portion of the highway that is open but which is approaching construction work"].)

Similarly, they omit to address the significance of *Briggs v. State of California* (1971) 14 Cal.App.3d 489 [92 Cal.Rptr. 433], which Appellant cited in her opposition to the motion for summary judgment and cites again on appeal. The court in *Briggs* held the State of California liable for damages for wrongful death, in connection with a traffic accident on a public highway. Liability was based on Government Code section 835, which provides: "Except as provided by statute, a public entity is liable for injury caused by

a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

In *Briggs*, the state was held liable even though the dangerous condition arose because mud from neighboring private property slid down a slope and onto the highway. A question arose as to whether the state had actual or constructive notice of the instability of the adjacent property in sufficient time to anticipate a mudslide and take measures to protect the traveling public. The court held repeated slippage had put the state on constructive notice of the dangerous condition and that the state had not taken adequate measures to warn motorists of the potential hazard. (*Briggs v. State of California, supra*, 14 Cal.App.3d at pp. 497-498.)

The *Briggs* court quoted with approval a Law Revision Commission comment to Government Code section 830: " ' "A public entity may be liable only for dangerous conditions of its own property. But its own property . . . *may be considered dangerous if a condition on the adjacent property exposes those using the public property to a substantial risk of injury.*" [Italics added.]' " (*Briggs v. State of California, supra*, 14 Cal.App.3d at p. 499; see also *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 841 [206 Cal.Rptr. 136, 686 P.2d 656].) Just as the state was held liable for failure to warn motorists of the hazard of driving on the highway when there was a risk that mud from neighboring property might cascade onto it, a question arises as to whether TCA could be held liable under Government Code section 835 for failure to warn motorists of the hazard of driving on Marine Way when there was a risk that construction materials on the overpass might be thrown onto the highway below in gale force winds.

The above cited authorities are more than ample to raise triable issues of material fact as to whether TCA and Silverado owed duties of care to the decedent. We therefore need not address the additional grounds Appellant contends support liability, including agency principles and various Labor Code and regulatory provisions.

(e) *Breach of duty*

Even so, there are issues as to whether any such duty was ever triggered in the context of this particular case. Did TCA or Silverado know construction

materials were falling on the street below or should they have known the winds were in such a state as to make falling construction debris foreseeable? Did Rados call TCA or Silverado and ask them to barricade the street and was there a duty to block the roadway in the absence of such a request? Even if TCA or Silverado knew or should have known of the dangerous condition, could either one have had a traffic control crew in place in time to block the flow of traffic, including the decedent's vehicle?

Appellant presented evidence on weather conditions, Silverado's knowledge of dangers associated with flying debris in high winds, prior communications between Silverado and Rados in connection with closing roadways, the time it would have taken Silverado to get a crew in place, and related matters. In sum, her evidence was sufficient to create a triable issue of fact as to breach of duty. (See *Carson v. Facilities Development Co., supra,* 36 Cal.3d at p. 843 [whether reasonable inspection might have revealed dangerous condition and whether there was sufficient time for preventive measures are jury questions].) As we will show, she presented sufficient evidence to create a triable issue of fact as to causation, as well.

### (4) *Triable Issues re Causation*

 Appellant's causation theory is essentially this: Had the road been blocked, the decedent never would have arrived on the scene and never would have been struck by the falling debris while trying to protect others. One might call this speculation, and as indicated in *Saelzler v. Advanced Group 400, supra,* 25 Cal.4th at pages 775-776, pure speculation is not enough. *Saelzler* addressed the liability of apartment owners to persons suffering injury on the premises due to the criminal acts of others and the thrust of the decision was to make certain owners of low-cost housing units do not become insurers of absolute safety. (*Id.* at pp. 766, 777.) The plaintiff in that case asserted the apartment owner was liable for her injuries due to a failure to provide adequate security on the premises. However, she had absolutely no evidence about the identity of the assailants who attacked her and whether they were authorized to be on the premises, making her theory of causation entirely speculative. In the case before us, on the other hand, Appellant did present some evidence relevant to causation.

Appellant presented evidence showing the decedent parked his truck so as to block traffic and turned on his flashing beacon. The court must consider this evidence and "all of the inferences drawn therefrom. . . . (Code Civ. Proc., § 437c, subd. (c).)" (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 856.) "[I]f the court concludes that the plaintiff's evidence or

inferences raise a triable issue of material fact, it must conclude its consideration and deny the defendants' motion." (*Ibid.*)

Here, one may infer several things from the decedent's actions. One may infer that he blocked the roadway with his vehicle so as to protect the traveling public. One may also infer he did this because he appreciated the fact that falling construction materials presented a hazard to anyone traveling on the roadway below the bridge. In addition, one may infer that since he appreciated the risk of harm, he would not have exposed himself to that risk, unless he had a motive to protect others. In other words, had the roadway been blocked so members of the traveling public could not have been exposed to the danger, he would have had no reason to risk his own life.

TCA and Silverado counter that the decedent was a Rados employee assisting other Rados employees in securing construction materials. They cite to the portion of the subcontract requiring Rados to clean up and remove its construction materials. They urge the court to infer the decedent would have been involved in that activity even if the roadway had been blocked. More particularly, they assert that the decedent, as a Rados foreman, was *obliged* to retrieve the construction materials and speculate that he simply would have gone around any blockade in order to do so.[2] Not surprisingly, they make no mention of the portion of the Design/Build Contract requiring Silverado to ensure that all persons, including construction personnel, comply with traffic control requirements and to compel anyone not doing so to leave the site. Similarly, they make no comment on Vehicle Code section 21367, subdivisions (b) and (c), providing respectively that it is unlawful "to disobey the instructions of a person controlling and directing traffic pursuant to subdivision (a)," and "to fail to comply with the directions of warning signs, lights, or other control devices provided for the regulation of traffic pursuant to subdivision (a)."

Clearly, the parties have suggested conflicting inferences. ■ "[E]ven though the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact.* . . . In so doing, it does not decide on any

[2]TCA and Silverado have requested this court to take judicial notice of two pages of a map. They assert that the pages are relevant to the issue of whether there was any alternative route by which the decedent could have left his original worksite and returned to the construction headquarters without traveling on Marine Way. However, these pages were not presented to the trial court. Moreover, they lack any indication of the location of either the decedent's original worksite or the construction headquarters. The request is denied.

finding of its own, but simply decides what finding such a trier of fact could make for itself. [Citations.]" (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 856, fn. omitted; accord, *Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1149 [119 Cal.Rptr.2d 131].)

█ Here, it may be fair to speculate that a Rados foreman would have ignored any Silverado barricade and sought to retrieve Rados construction materials despite the wind conditions. Nonetheless, "considering the totality of the evidence, we believe a rational trier of fact could reasonably conclude" (*Colarossi v. Coty US Inc., supra*, 97 Cal.App.4th at p. 1155) the decedent would have waited for the wind to subside before engaging in the hazardous activity had a barricade been in place and had the safety of motorists not been involved, and thus the lack of a barricade was a substantial factor in causing the decedent's death. "The fact there is evidence which would support either conclusion convinces us the trial court erred in granting summary judgment . . . ." (*Ibid.*, fn. omitted; see also *Tankersley v. Low & Watson Constr. Co., supra*, 166 Cal.App.2d at p. 821 [whether the failure to comply with statutory requirements in the erection of a roadway barrier proximately caused the accident was a question of fact for the jury].)

## C. *Conclusion*

TCA and Silverado, as the moving parties, had the burden of persuasion to show a complete defense to Appellant's causes of action. They rested their motion on a faulty legal premise—that *Privette* and *Toland* conclusively absolved them of any possible liability. The Appellant having asserted certain direct liability causes of action that were potentially viable in light of recent California Supreme Court decisions, the court erred in granting summary judgment based on the *Privette/Toland* rationale.

To the extent TCA and Silverado showed a lack of either duty or causation, Appellant succeeded in raising triable issues of material fact as to each of those points. While it is necessary to draw inferences from Appellant's evidence in order to reach this conclusion, the court is charged with considering both the direct evidence and the inferences reasonably drawn therefrom. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 843.) The court must also view the evidence "in the light most favorable to the opposing party." (*Ibid.*) █ As we said in *Colarossi*, "in reviewing summary judgment 'we must construe plaintiff's evidence liberally and accept all reasonable inferences which could be drawn by a trier of fact in favor of plaintiff.' " (*Colarossi v. Coty US Inc., supra*, 97 Cal.App.4th at p. 1152.) Applying these standards, we conclude a trial is necessary to resolve the dispute and Appellant is entitled to her day in court.

## III

### DISPOSITION

The judgment is reversed. Appellant shall recover her costs on appeal.

Sills, P. J., and Bedsworth, J., concurred.

A petition for a rehearing was denied June 19, 2002, and respondents' petition for review by the Supreme Court was denied August 28, 2002. Kennard, J., was of the opinion that the petition should be granted.