# IN THE SUPREME COURT OF CALIFORNIA

JOSE M. SANDOVAL,

Plaintiff and Appellant,

v.

QUALCOMM INCORPORATED,

Defendant and Appellant.

S252796

Fourth Appellate District, Division One

D070431

San Diego County Superior Court

37-2014-00012901-CU-PO-CTL

___

September 9, 2021

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Kruger, Jenkins, and Feuer\* concurred.

___

\*       Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

SANDOVAL v. QUALCOMM INCORPORATED

S252796

Opinion of the Court by Cuéllar, J.

An electrical parts specialist sustained third degree burns to over one third of the surface area of his body after he triggered an arc flash from a circuit he did not realize was "live" with flowing electricity. The contractor for whom he'd been working had removed the protective cover on that live circuit while work was underway. A jury concluded that the contractor acted negligently and was liable for the injuries. What this case is about is whether further liability arises for the company that *hired* the contractor, owned the premises, and operated the electrical equipment. The answer here is no.

Strong public policy considerations readily acknowledged in our past decisions generally support a straightforward presumption about the responsibilities of hirers and contractors for worker injuries in situations like this: A person or entity hiring an independent contractor (a "hirer") ordinarily delegates to that independent contractor all responsibility for the safety of the contractor's workers. (*SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 597, 600, 602 (*SeaBright*).) This presumption is rooted in hirers' reasons for employing contractors in the first place, and society's need for clear rules about who's responsible for avoiding harms to workers when contractors are hired. We have therefore generally avoided subjecting hirers to tort liability for those workers' injuries. (See *id.* at pp. 598–599.) But that presumption gives way to two recognized exceptions: where the hirer either withholds critical

information regarding a concealed hazard (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 664 (*Kinsman*)); or retains control over the contractor's work and actually exercises that control in a way that affirmatively contributes to the worker's injury (*Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 202 (*Hooker*)).  The parties dispute how this presumption of delegation and its two exceptions apply here.  The Court of Appeal affirmed a jury verdict finding the hirer liable under a retained control theory of liability.

What we conclude is that defendant Qualcomm Incorporated, the hirer in this case, owed no tort duty to plaintiff Martin Sandoval, the parts specialist working for Qualcomm's contractor, at the time of Sandoval's injuries.  Although Qualcomm performed the partial power-down process that preceded the contractor's work and resulted in the presence of the live electrical circuit, we conclude on the record here that Qualcomm neither failed to sufficiently disclose that hazard under *Kinsman* nor affirmatively contributed to the injury under *Hooker*.  We also conclude that the pattern jury instruction used in this case — CACI No. 1009B — does not adequately capture the elements of a *Hooker* claim.  So we reverse the judgment of the Court of Appeal and remand this case.  The appellate court is instructed to remand this case to the trial court, so it can enter judgment for Qualcomm notwithstanding the verdict.

## I.

### A.

Qualcomm powers its San Diego campus from two sources of electricity:  the local electric utility and Qualcomm's onsite turbine generators — both of which feed into an electrical

switchgear.[1]  The switchgear consists largely of busbars, which are large metal bars that conduct electricity much like power cables, and medium-voltage circuit breakers, which are 900-pound machines that automatically interrupt faulty current flow much like their tiny cousins in a house's fuse box.  Each circuit breaker and its incoming and outgoing busbars reside within a particular cubicle in a long row of tall metal cabinets.  Each cubicle allows access from the front side and from the back side by removing a bolted-on protective cover.  The cubicles all look very similar, particularly on the back side.

Qualcomm planned to upgrade its onsite turbine generators in 2013.  In order to accommodate this upgrade, Qualcomm hired TransPower Testing, Inc., an electrical engineering service company, to inspect and verify the amperage capacity of Qualcomm's existing switchgear equipment.  Frank Sharghi, TransPower's president, is a licensed electrical engineer and had worked on that switchgear at least monthly for nearly 20 years, since before Qualcomm acquired the campus.  After Sharghi was unable to locate some of the busbars in the "main cogen" circuit during one inspection, Sharghi hired Sandoval — an electrical parts supply and repair specialist with ROS Electrical Supply & Equipment — to accompany him at a second inspection.  For this second inspection, Qualcomm approved a scope of work authorizing TransPower to inspect the main cogen circuit from the front and

---

[1]  Because this case comes to us on appeal of the denial of Qualcomm's motion for judgment notwithstanding the verdict, we summarize the evidence in the light most favorable to Sandoval.  (See *Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192 (*Webb*).)

back.  Qualcomm did not authorize TransPower to inspect (or expose) any other circuits at this time.

On the morning of the second inspection, Sharghi gathered with his workers — Sandoval, TransPower employee George Guadana, and Sharghi's son, Omid — at the Qualcomm power plant.  They attended a safety briefing led by Qualcomm plant operator Mark Beckelman.  In the course of discussing several matters pertinent to the job, Beckelman reminded Sharghi and his team that some circuits in the switchgear would remain live.  Both Qualcomm's employees and TransPower's workers then proceeded to the switchgear room.

Qualcomm's employees — Beckelman and two others — then performed what we will refer to as the power-down process: a process of multiple steps designed to ensure there would be no live electricity flowing through the main cogen cubicle during the inspection.  Qualcomm's employees wore arc flash protection suits for this process.  Beckelman directed the TransPower team — who, except Guadana, were not wearing arc flash suits — to stand at a safe distance.  Having shut off all turbine and emergency diesel generators, the Qualcomm employees disconnected ("racked out") the corresponding generator breakers in the switchgear as well as the "sync-tie" breaker connecting the main cogen circuit to utility power.  This cut off every source of power that could possibly flow to the main cogen cubicle.  They performed a "lockout/tagout" on each of these breakers, a procedure which physically prevents anyone from inadvertently reconnecting them.  As for the main cogen breaker, they not only racked it out and performed a lockout/tagout, but they also opened the front panel covering its cubicle, physically removed the 900-pound breaker, and placed the breaker on the floor in front of the switchgear cabinets.  They

now had access to the main cogen busbars deep inside the cubicle, and they used a voltmeter to confirm that those busbars were dead. Sharghi observed the power-down process carefully "to make sure they [didn't] miss anything." All other circuits in the switchgear room remained live with utility power.

Qualcomm's employees soon exited the switchgear room. But before they did, Beckelman confirmed with Sharghi that Sharghi was satisfied with Qualcomm's power-down of the main cogen circuit, and that Sharghi understood which circuits were now dead (the "safe zone") and which were still live (the "no-safe zone"). Sandoval did not hear this exchange between Beckelman and Sharghi.

At approximately this point, Guadana — wearing his arc flash protection — performed a grounding process on the back side of the main cogen cubicle. He removed the cubicle's back panels, confirmed with TransPower's own voltmeters that the main cogen circuit was indeed dead, bled any residual energy, and attached grounding cables as an additional safety precaution. The record is inconsistent regarding whether Guadana performed this grounding process before or after Qualcomm's employees left the room, and with or without Qualcomm's employees' assistance and/or supervision.

After Qualcomm's employees left the switchgear room, Sharghi instructed Guadana — still wearing his arc flash protection — to also remove the bolted-on back protective panel from the immediately adjacent GF-5 cubicle. As Sharghi well knew, the GF-5 circuit was still live with electricity from utility power. Sharghi would later testify that his reason for instructing Guadana to remove the GF-5 cubicle's back panel was that he wanted to take photographs for purposes of an

5

unrelated previous inspection. Sharghi told no one that he was exposing a live circuit.

Either while Guadana was removing the back GF-5 panel or immediately afterward, the TransPower team began their inspection of the main cogen busbars from the front side of the switchgear cabinets.

At some point during this inspection, Sandoval walked away from the rest of the TransPower team. Sharghi would later testify that he thought Sandoval was going to get paper and pen. Sandoval would later recall that he was having trouble judging the size of some of the main cogen busbars from the front side of the cabinet, and he thought he might be able to get a better view from the back. Sandoval called out to Guadana to join him. Sandoval asked Guadana to hold a flashlight as they both approached the back side of the cabinets. Guadana was still wearing his arc flash protection. Sandoval was holding a metal tape measure.

The metal tape measure triggered an arc flash from the live, exposed GF-5 circuit. As best as Qualcomm could later reconstruct the incident from the physical evidence, Sandoval had inadvertently tried to measure the GF-5 busbars instead of the main cogen busbars. Sandoval recalls everything going blue, and screaming. The 4,160-volt arc flash — thousands of degrees in temperature — had set him aflame. Sharghi and Omid heard the "bang" as the arc flash tripped the breaker. Guadana and Omid managed to smother the fire. Beckelman heard the bang from the control room downstairs. When Beckelman reached the switchgear room, he found Sandoval lying facedown and screaming, "Why was it live? It shouldn't be live."

Sandoval spent over a month in the hospital. He sustained third degree burns — burns so deep the whole body is compromised, requiring multiple skin graft procedures — to about one third of his body surface, including his face, neck, torso, and arms. He also experienced additional second degree burns, pneumonia, multiple infections, lasting discomfort, and loss of full use of his left arm.

## B.

Sandoval filed suit against Qualcomm, TransPower, and ROS Electrical Supply, asserting claims for negligence and premises liability. Qualcomm moved for summary judgment on the basis that the presumption of delegation should shield it from liability here. Denying the motion, the trial court found a triable issue as to whether Qualcomm affirmatively contributed to Sandoval's injury. Before trial began, Qualcomm objected to the use of CACI No. 1009B — the pattern jury instruction setting out the elements of a *Hooker* claim — on the ground that it didn't adequately convey the element of affirmative contribution. The trial court denied the objection. At the same time, the trial court noted its intention to instruct the jury that *Kinsman* — the case pertaining to a hirer's duty to disclose concealed hazards on the hirer's premises — did not require Qualcomm to disclose the live circuits to Sandoval personally. As a result, Sandoval withdrew his premises liability claim against Qualcomm.

Following trial, the jury returned a special verdict imposing liability on Qualcomm for Sandoval's injuries. Applying CACI No. 1009B, the jury found that Qualcomm retained control over the safety conditions of the worksite, that Qualcomm negligently exercised that control, and that

Qualcomm's negligence was a substantial factor in causing Sandoval's injuries. The jury awarded Sandoval over $1 million in past and future medical expenses and $6 million in noneconomic damages. It apportioned the fault 46 percent to Qualcomm, 45 percent to TransPower, and 9 percent to Sandoval.

Qualcomm moved for judgment notwithstanding the verdict and for a new trial. The trial court rejected Qualcomm's argument that it was entitled to judgment notwithstanding the verdict for lack of any triable issue on affirmative contribution. The court granted Qualcomm's motion for a new trial, however, on the ground that the jury had improperly apportioned liability.

The Court of Appeal affirmed. It, too, rejected both of Qualcomm's arguments: that CACI No. 1009B was an inaccurate statement of the law as it relates to hirer liability, and that Qualcomm wasn't liable to Sandoval because it did not affirmatively contribute to his injuries. (*Sandoval v. Qualcomm Inc.* (2018) 28 Cal.App.5th 381, 417–420 (*Sandoval*).)

We granted review to resolve whether a hirer of an independent contractor may be liable to a contractor's employee based only on the hirer's failure to undertake certain safety measures to protect the contractor's employees, and whether CACI No. 1009B accurately states the relevant law.

## II.

### A.

When a person or organization hires an independent contractor, the hirer presumptively delegates to the contractor the responsibility to do the work safely. (*SeaBright, supra,* 52 Cal.4th at pp. 597, 600, 602; *Kinsman, supra,* 37 Cal.4th 659,

671.) This presumption is grounded in two major principles: first, that independent contractors by definition ordinarily control the manner of their own work; and second, that hirers typically hire independent contractors precisely for their greater ability to perform the contracted work safely and successfully. (*Privette v. Superior Court* (1993) 5 Cal.4th 689, 693 (*Privette*).) Because this actual transfer of control tends to be desirable for both private parties and society, the long-standing common law rule was that a hirer bore no liability for injuries caused by the negligence of the contractor. (*Privette*, *supra*, 5 Cal.4th at p. 693; see *Snyder v. Southern Cal. Edison Co.* (1955) 44 Cal.2d 793, 799; *Green v. Soule* (1904) 145 Cal. 96, 99–100; *Frassi v. McDonald* (1898) 122 Cal. 400, 402; *Callan v. Bull* (1896) 113 Cal. 593, 598.)

But ability to prevent an injury is not the only important consideration in the formulation of tort doctrines. Courts have now diluted the original, plain vanilla common law rule in various ways depending on the identity of the injured party. Where an injury befalls a hapless third party, the paramount concerns have been about ensuring victim compensation. Lest the victim be limited to suing an insolvent contractor, courts have extended various theories of direct and vicarious liability so the injured third party can recover from the hirer. (*Privette*, *supra*, 5 Cal.4th at pp. 694–695.) As between an unrelated third party and a hirer, courts have preferred to let the loss lie with the party for whose benefit the contracted work was undertaken. (*Id.* at p. 694.)

Conversely, where the injury falls on a "contract worker,"[2] concerns about the distribution of tort burdens as between the hirer and contractor have become paramount:  Given that the Workers' Compensation Act protects the contractor — but not the hirer[3] — from tort liability, and already ensures compensation for contract worker injuries, we have concluded that it is ordinarily unfair to let a contract worker recover from the hirer for the contractor's negligence.  (See *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253, 270 (*Toland*).)  The hirer is typically less knowledgeable and more poorly positioned to prevent injury to the contract workers than the contractor is.  (*Privette*, *supra*, 5 Cal.4th at pp. 693, 700.)  Typically, the hirer indirectly pays for workers' compensation insurance in the contract price.  (*Id.* at p. 699.)  And the contractor's insurance premiums and, often, personal relationship with its workers already give the contractor compelling incentives to ensure a safe workplace.  (See *id.* at pp. 693, 700.)  We refer to this principle that a hirer is ordinarily not liable to the contract

---

[2]  We use the term "contract worker" herein as a shorthand for the independent contractor personally, the independent contractor's employees, the independent contractor's subcontractors personally, the subcontractors' employees, and so on.  (See, e.g., *Padilla v. Pomona College* (2008) 166 Cal.App.4th 661, 668–671, 676 (*Padilla*) [applying *Privette* doctrine to subcontractor's employee]; accord, *Khosh v. Staples Construction Co., Inc.* (2016) 4 Cal.App.5th 712, 718–719, 721 (*Khosh*) [same].)

[3]  In *Pacific Gas & Electric Co. v. Industrial Accident Commission* (1919) 180 Cal. 497, we held unconstitutional the award of workers' compensation against a person other than the immediate employer.  (See *id.* at p. 503.)

workers as the *Privette* doctrine, for the first case in which we announced it.

Over time, we've recast our primary rationale for the *Privette* doctrine in terms of delegation rather than workers' compensation. Because we typically expect contractors to perform the contracted work more safely than hirers, we have endorsed a "strong policy" of presuming that a hirer delegates all control over the contracted work, and with it all concomitant tort duties, by entrusting work to a contractor. (*SeaBright*, *supra*, 52 Cal.4th at p. 596.) In light of this presumption, we have refused to extend liability to hirers even on theories of nominally "direct" liability, such as negligent failure to require precautions or negligent hiring of an incompetent contractor. (*Toland*, *supra*, 18 Cal.4th at p. 265; *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1241 (*Camargo*).) We reasoned that liability for a hirer's failure to ensure the contractor takes reasonable care is "in essence 'vicarious' or 'derivative,'" and thus impermissible under the *Privette* doctrine. (*Toland*, at p. 265; see *Camargo*, at p. 1241.) Likewise, even where workers' compensation is not available, we have refused to let an independent contractor personally sue a hirer under a vicarious liability theory, reasoning that society can readily expect a competent contractor to have both good reason and knowledge to exercise responsibility over the contractor's own personal safety. (*Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518, 521 (*Tverberg I*).)

But the *Privette* doctrine has its limits. Sometimes a hirer intends to delegate its responsibilities to the contractor in principle but, by withholding critical safety information, fails to effectively delegate its responsibilities in practice; or a hirer delegates its responsibilities only partially by retaining control

of certain activities directly related to the contracted work. When such situations arise, the *Privette* doctrine gives way to exceptions. In *Kinsman*, we articulated the rule that a landowner-hirer owes a duty to a contract worker if the hirer fails to disclose to the contractor a concealed premises hazard. (*Kinsman*, *supra*, 37 Cal.4th at p. 664.) And in *Hooker*, we articulated the rule that a hirer owes a duty to a contract worker if the hirer retains control over any part of the work and actually exercises that control so as to affirmatively contribute to the worker's injury. (*Hooker*, *supra*, 27 Cal.4th at p. 202.)

## B.

Bearing these principles in mind, we begin by considering whether this case implicates our presumption of delegation, and, if so, whether the concealed hazards exception applies here. The answers are yes and no, respectively.

## 1.

A presumptive delegation of tort duties occurs when the hirer turns over control of the worksite to the contractor so that the contractor can perform the contracted work. Our premise is ordinarily that when the hirer delegates control, the hirer simultaneously delegates all tort duties the hirer might otherwise owe the contract workers. (*Tverberg I*, *supra*, 49 Cal.4th at p. 528; *Kinsman*, *supra*, 37 Cal.4th at p. 671.) Whatever reasonable care would otherwise have demanded of the hirer, that demand lies now only with the contractor. If a contract worker becomes injured after that delegation takes place, we presume that the contractor alone — and not the hirer — was responsible for any failure to take reasonable precautions.

That said, this presumption gives way to the two recognized exceptions that apply where delegation is either ineffective or incomplete. We briefly consider the exception for the former situation — the concealed hazards exception.

In *Kinsman* we recognized that a landowner-hirer cannot effectively delegate its duties respecting a concealed hazard without disclosing that hazard to the contractor. (See *Kinsman, supra*, 37 Cal.4th at p. 674.) In this context, a "concealed" hazard means something specific: a hazard that the hirer either knows or reasonably should know exists, and that the contractor does not know exists and could not reasonably discover without the hirer's disclosure. (*Id.* at p. 675.) We draw no distinction between a hazard whose very existence is concealed and a hazard which is in some way apparent but whose dangerousness is concealed. (*Id.* at p. 678.) The sufficiency of the hirer's disclosure is "measured by a negligence standard," that is, a standard of reasonable care. (*Id.* at p. 680.) If the hirer does not sufficiently disclose the concealed hazard, the hirer retains its tort duties owed to the contract workers respecting that hazard. A contrary conclusion would cut against the rationale justifying *Privette*'s presumption of delegation. A contractor is not best situated to perform work safely when the contractor lacks critical information about relevant hazards. (*Kinsman, supra*, 37 Cal.4th at p. 679; see *Hooker, supra*, 27 Cal.4th at p. 213.) Nor is there any unfairness in holding the hirer liable where only the hirer possessed that critical knowledge. (See *Toland, supra*, 18 Cal.4th at p. 267.)

### 2.

The record evidence leaves no question that Qualcomm both turned over control of the worksite and sufficiently

disclosed all relevant concealed hazards before Sandoval's injury occurred. We therefore presume that Qualcomm owed Sandoval no tort duty respecting his injury, subject only to the retained control exception which we discuss in the subsequent section.

There is no dispute that Qualcomm turned over control of the worksite to TransPower before the injury. Although the record contains some ambiguity regarding when exactly the Qualcomm employees left the switchgear room, and when exactly TransPower began performing its inspection of the main cogen breaker, it is undisputed that both of these things occurred before Sandoval's injury. We need not resolve whether the turning over of control occurred before or after Guadana performed the grounding process. Even if Qualcomm did not turn over control until after the grounding process, Sandoval's injury occurred at least several minutes later still — well into TransPower's inspection of the main cogen circuit. The evidence therefore triggers a presumption that Qualcomm had delegated to TransPower all duties Qualcomm otherwise would have owed to Sandoval by the time of Sandoval's injury.

There is likewise no dispute that Qualcomm sufficiently disclosed to TransPower any relevant concealed hazards before Sandoval's injury. The relevant hazard was the presence of live circuits in the switchgear room. Sharghi — TransPower's president — admitted that he was well aware which circuits were live and which were not. Sharghi's knowledge might indicate that the live condition of the circuits was obvious or reasonably ascertainable for TransPower, in which case that condition was not actually "concealed." Or it might indicate that Beckelman accurately described the partially live condition of the equipment when he communicated with Sharghi before

leaving the switchgear room, in which case Qualcomm's disclosure was sufficient. Either way, the evidence establishes that Qualcomm effectively delegated to TransPower any tort duties Qualcomm otherwise would have owed Sandoval respecting these live circuits under *Kinsman*.[4]

What Sandoval posits is that because the power-down process was entirely Qualcomm's doing, Qualcomm bore responsibility for all power-related hazards. In other words, since Qualcomm didn't delegate to TransPower the performance of the power-down process, it couldn't have delegated its tort duties respecting the power-down process. If Sandoval had been injured *during* Qualcomm's performance of the power-down process, we might agree that no transfer of control or tort duties from Qualcomm to the contractor had yet occurred. (See *Tverberg I, supra*, 49 Cal.4th at p. 528 [the hirer delegates responsibility for performing the work safely "when" the hirer delegates control].) But timing matters, and Sandoval's injury occurred later. Once Qualcomm turned over control of the worksite, any tort duties Qualcomm had with respect to the safety of that site presumptively became TransPower's duties. (See *Horne v. Ahern Rentals, Inc.* (2020) 50 Cal.App.5th 192, 203 [where hirer performed noncontract work of driving and parking

---

[4] By dismissing his premises liability claim, Sandoval in fact waived any claim he might have had based on Qualcomm's failure to effectively delegate any landowner duties respecting the live circuits. We discuss such duties to provide guidance in future cases. Because there was no failure here to disclose critical information respecting a concealed hazard, we need not resolve whether Qualcomm's ability to delegate its *non*landowner duties respecting that hazard (Sandoval posits theories of undertaking and of past practice creating a risk of harm) may have also required a *Kinsman*-type disclosure.

forklift and *then* turned over control, hirer delegated to contractor responsibility for determining whether that location and positioning of the forklift was safe for conducting the contracted work of replacing the forklift's tires].)

Qualcomm's performance of the power-down process remains relevant only to the extent it implicates our two exceptions to this presumption. As to the first, to the extent that Qualcomm's performance of the power-down process resulted in the presence of a preexisting hazard (the live circuits), Qualcomm effectively delegated its duties respecting that hazard either because it was not concealed or because Qualcomm's disclosure was sufficient. As to the second, we consider in the following section whether Qualcomm owed Sandoval a duty on account of incomplete delegation, whether by virtue of Qualcomm's performance of the power-down process or otherwise.

## C.

We now consider whether substantial evidence supports the jury's conclusion that Qualcomm owed Sandoval a duty under the retained control exception to the ordinary limitations on hirer liability for injuries sustained by contract workers. (See *Webb*, *supra*, 63 Cal.4th at p. 192 [stating standard of review].) We conclude that the answer is no.

### 1.

In *Hooker*, we recognized that hirers do not always fully delegate control to their contractors. We concluded that in some such "retained control" situations, notwithstanding *Privette*'s presumption to the contrary, the hirer must owe a duty of care to the contract workers. (*Hooker*, *supra*, 27 Cal.4th at pp. 211–212; see *SeaBright*, *supra*, 52 Cal.4th 590 at pp. 599–600.)

The plaintiff in such cases must establish not only that the hirer retained control over the contracted work, but also that the hirer actually exercised that retained control in a manner that affirmatively contributed to the contract worker's injury. (*Hooker*, *supra*, 27 Cal.4th at p. 202.) Because *Hooker*'s application has produced significant confusion, we dwell at some length here on the meaning of *Hooker*'s three key concepts: retained control, actual exercise, and affirmative contribution.

A hirer "retains control" where it retains a sufficient degree of authority over the manner of performance of the work entrusted to the contractor. This concept simply incorporates the Restatements' theory of retained control: Against a backdrop of no hirer duty respecting the manner of performance of work entrusted to a contractor, the Restatements provide that a hirer who retains control over any part of that work owes others a duty of reasonable care respecting the hirer's exercise of that retained control. (See Rest.2d Torts, § 414; *Hooker*, *supra*, 27 Cal.4th at pp. 201–202 [incorporating Rest.2d Torts, § 414]; Rest.3d Torts, Liability for Physical and Emotional Harm, § 56 [modern version of Rest.2d Torts, § 414].) So "retained control" refers specifically to a hirer's authority over work entrusted to the contractor, i.e., work the contractor has agreed to perform. For simplicity we will often call this the "contracted work" — irrespective of whether it's set out in a written contract or arises from an informal agreement. A hirer's authority over noncontract work — although potentially giving rise to other tort duties — thus does not give rise to a retained control duty unless it has the effect of creating authority over

the contracted work.[5]  (See Rest.3d Torts, *supra*, § 56, com. b, pp. 390–392.)   Furthermore, a hirer's authority over the contracted work amounts to retained control only if the hirer's exercise of that authority would sufficiently limit the contractor's freedom to perform the contracted work in the contractor's own manner.  (*Id.*, com. c, p. 392; see, e.g., *Grahn v. Tosco Corp.* (1997) 58 Cal.App.4th 1373, 1395 ["the 'control' necessary to give rise to a duty of care under Restatement [Second of Torts] section 414" is "not simply general control over the premises," but control "over the methods of the work or the manner in which the contractor's employees perform the operative details of their tasks"], disapproved on other grounds in *Hooker*, *supra*, 27 Cal.4th at p. 214 and *Camargo*, *supra*, 25 Cal.4th at p. 1245; *McDonald v. Shell Oil Co.* (1955) 44 Cal.2d 785, 790 ["the [hirer] may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract —

---

**5**     Some line-drawing questions will of course arise when it comes to how generally or specifically to understand the scope of the contracted work.   Consistent with the *Privette* presumption that the hirer delegates the responsibility to perform the contracted work safely, we presume that scope encompasses at minimum the taking of reasonable precautions during the performance of the work.

We also acknowledge that it will not always be easy to distinguish between (a) contracted work over which the hirer retained control, and (b) noncontract work in which the contractor had some involvement but which the hirer controlled to such a great extent that we would not say it was *entrusted* to the contractor.   For instance, it might be difficult to say whether the hirer in *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582 (*Regalado*) was performing the noncontract work of obtaining permits, or retaining control over the permitting aspect of the contracted work.   (See *id.* at pp. 587–588.)

including the right to inspect [citation], the right to stop the work [citation], the right to make suggestions or recommendations as to details of the work [citation], the right to prescribe alterations or deviations in the work [citation] — without" incurring a retained control duty].)

The parties dispute whether Qualcomm retained control "over safety conditions at the worksite," a phrase we used in *Hooker*. (*Hooker*, *supra*, 27 Cal.4th at pp. 202, 215.) But the pivotal question here is whether the hirer retained a sufficient degree of control over the manner of performing the contracted work. *Hooker* itself gave us no reason to draw a meaningful distinction between control over the manner of performing the contracted work and control "over safety conditions at the worksite," because the hirer was alleged to have retained control over the manner of performing the contracted work by retaining the right to take corrective safety measures during the contractor's performance of the work entrusted to it. (*Id.* at p. 202.) And in any event, one might question whether it's even possible to retain control over safety conditions without also retaining some control over the manner of performing the contracted work. To the extent that "control over safety conditions" (*ibid.*) might be taken to mean control over the presence of preexisting hazards, though, as Sandoval argues by implication, the phrase is unhelpful here. A hirer might be responsible for the presence of a hazard and even convey an expectation that the contractor perform its work without eliminating that hazard altogether, and yet leave the contractor ample freedom to accommodate that hazard effectively in whatever manner the contractor sees fit. (See, e.g., *Padilla*, *supra*, 166 Cal.App.4th at p. 671 [hirer did not retain control by expecting contractor to work in presence of pressurized water

pipe where hirer disclosed the pipe's condition and contractor had ample freedom to perform its work in its own manner without contacting the pressurized pipe].) In such instance, the hirer does not necessarily retain a sufficient degree of control over the contractor's manner of performing the contracted work to constitute "retained control."

What we decided in *Hooker* was that, even if hirers may owe unrelated third parties a retained control duty based on retained control alone, hirers owe the contract workers a retained control duty only with something more. Contract workers must prove that the hirer *both* retained control *and* actually exercised that retained control in such a way as to affirmatively contribute to the injury. (*Hooker, supra*, 27 Cal.4th at p. 202.)

A hirer "actually exercise[s]" its retained control over the contracted work when it involves itself in the contracted work "such that the contractor is not entirely free to do the work in the contractor's own manner." (Rest.3d Torts, *supra*, § 56, com. c, p. 392; see *Thompson v. Jess* (Utah 1999) 979 P.2d 322, 327; *Hooker, supra*, 27 Cal.4th at p. 209 [endorsing an approach similar to *Thompson*'s].) In other words, the hirer must exert some influence over the manner in which the contracted work is performed. Unlike "retained control," which is satisfied where the hirer retains merely the *right* to become so involved, "actual exercise" requires that the hirer in fact involve itself, such as through direction, participation, or induced reliance.[6] (See, e.g.,

---

[6] Although "active participation" may be one way of exerting influence over the manner of performance (*Tverberg v. Fillner Construction, Inc.* (2012) 202 Cal.App.4th 1439, 1446 (*Tverberg*

*Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28, 39 (*Kinney*) [a hirer's "mere failure to exercise a power to compel the [contractor] to adopt safer procedures does not, without more, violate any duty owed to the [contract worker]"]; *Hooker, supra,* 27 Cal.4th at p. 209 [quoting and agreeing with this passage in *Kinney*].)

"Affirmative contribution" means that the hirer's exercise of retained control contributes to the injury in a way that isn't merely derivative of the contractor's contribution to the injury. (See *Hooker, supra,* 27 Cal.4th at p. 212 [hirer liability based on affirmative contribution does not merely " ' "derive[] from the 'act or omission' of the hired contractor" ' "].) Where the contractor's conduct is the immediate cause of injury, the affirmative contribution requirement can be satisfied only if the hirer in some respect induced — not just failed to prevent — the contractor's injury-causing conduct. (See, e.g., *Kinney, supra,* 87 Cal.App.4th at p. 36 [requiring that the hirer "induc[e] [the contractor's] injurious action or inaction through actual direction, reliance on the hirer, or otherwise"]; *Hooker,* at p. 211 [quoting and agreeing with this passage in *Kinney*]; *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 225 [finding affirmative contribution where hirer "requested" that contractor use faulty equipment, thus at least in part inducing the

_____

*II*); see *Khosh, supra,* 4 Cal.App.5th at p. 718; *Alvarez v. Seaside Transportation Services LLC* (2017) 13 Cal.App.5th 635, 641), it is not necessarily the only way. (See, e.g., *Ray v. Silverado Constructors* (2002) 98 Cal.App.4th 1120, 1133–1134 (*Ray*) [finding *Hooker* test satisfied where hirer had contractually prohibited contractor from unilaterally undertaking a crucial safety measure but was not actively participating in the contracted work at the time of the injury].)

contractor's decision to use it].)  It is not enough for the hirer's exercise of control to incidentally give the hirer the *opportunity* to prevent the contractor's injury-causing conduct.  (See *Hooker*, at p. 214 [finding no affirmative contribution where the onsite hirer had the authority and opportunity to stop the contractor from allowing traffic across the overpass, but did not induce the contractor to allow such traffic — the hirer merely "*permitted*" the traffic].)

A hirer's conduct also satisfies the affirmative contribution requirement where the hirer's exercise of retained control contributes to the injury independently of the contractor's contribution (if any) to the injury.  (See, e.g., *Hooker*, at p. 212, fn. 3 [observing that hirer liability would be appropriate where "the hirer promises to undertake a particular safety measure, then . . . negligent[ly] fail[s] to do so"]; *Ray*, *supra*, 98 Cal.App.4th at pp. 1133–1134 [finding *Hooker* liability where hirer prohibited contractor from erecting road barricade that might have prevented injury].)

The critical factor here is the relationship between the hirer's conduct and the contractor's conduct, not whether the hirer's conduct, assessed in isolation, can be described as "affirmative conduct."  (*Madden v. Summit View, Inc.* (2008) 165 Cal.App.4th 1267, 1276.)  Importantly, neither "actual exercise" nor "affirmative contribution" requires that the hirer's *negligence* (if any) consist of an affirmative act.  The hirer's negligence may take the form of any act, course of conduct, or failure to take a reasonable precaution that is within the scope of its duty under *Hooker*.  (See Rest.3d Torts, *supra*, § 3, com. c, pp. 29–30; *Hooker*, *supra*, 27 Cal.4th at p. 212, fn. 3 [noting that a hirer may be liable based on *failing* to undertake a promised safety measure]; *Ray*, *supra*, 98 Cal.App.4th at pp. 1133–1134

[finding triable issue on affirmative contribution where hirer retained exclusive authority over road barricades and *failed* to erect barricade around fallen debris that contractor was trying to clear when injury occurred].)

Contrary to the Court of Appeal's reasoning (*Sandoval, supra,* 28 Cal.App.5th at p. 417; see also *Regalado, supra,* 3 Cal.App.5th at pp. 594–595), affirmative contribution is a different sort of inquiry than substantial factor causation. For instance, a fact finder might reasonably conclude that a hirer's negligent hiring of the contractor was a substantial factor in bringing about a contract worker's injury, and yet negligent hiring is not affirmative contribution because the hirer's liability is essentially derivative of the contractor's conduct. (See *Camargo, supra,* 25 Cal.4th at p. 1238 [applying the *Privette* doctrine to reject negligent hiring as a theory under which contract workers may sue hirers]; *Hooker, supra,* 27 Cal.4th at pp. 211–212 [contrasting affirmative contribution with *Camargo*].) Conversely, affirmative contribution does not itself require that the hirer's contribution to the injury be substantial.

If a plaintiff proves that the hirer actually exercised retained control in a way that affirmatively contributed to the contract worker's injury, the plaintiff establishes that the hirer owed the contract worker a duty of reasonable care as to that exercise of control. (Cf. Rest.3d Torts, *supra,* § 56, subd. (b).)[7]

---

[7] We emphasize that the test we articulated in *Hooker* establishes *only* whether the hirer owed a duty to the contract worker. (See *Kinney, supra,* 87 Cal.App.4th at p. 39.) The *Hooker* test does not establish, for instance, whether the hirer's

The *Privette* doctrine does not bar liability. (See *Hooker*, *supra*, 27 Cal.4th at pp. 211–212.)

Imposing this duty on the hirer where *Hooker*'s test is satisfied is consistent with the strong policy of delegation that undergirds the *Privette* doctrine. (See *SeaBright*, *supra*, 52 Cal.4th at p. 596.) A hirer's mere authority to prevent or correct a contractor's unsafe practices (retained control) does not, without more, limit the contractor's delegated control over the work. But to the extent that the hirer exerts influence over the contracted work such that the contractor is not entirely free to perform the work in the contractor's own manner (actual exercise), the hirer does limit the contractor's delegated control. Still, we impose a duty only where that limitation itself contributed to the worker's injury (affirmative contribution), rather than where that limitation incidentally created an opportunity for the hirer to prevent the contractor's injury-causing conduct. (See *Hooker*, *supra*, 27 Cal.4th at pp. 211–212; *Kinsman*, *supra*, 37 Cal.4th at pp. 671–672 [explaining the holdings in *Ray*, *supra*, 98 Cal.App.4th 1120 and *Austin v. Riverside Portland Cement Co.* (1955) 44 Cal.2d 225 in terms of limited delegation].)

Imposing a duty on the hirer under these limited circumstances also furthers at least three of the major tort law goals underlying the policy of delegation we detailed in our past cases applying *Privette*. First, *Hooker*'s rule should tend to

---

conduct was negligent, whether the hirer's negligence was a substantial factor in causing the injury, or what the comparative level of fault may have been between the hirer and the contractor. (Contra, *Padilla*, *supra*, 166 Cal.App.4th at p. 670.)

improve worksite safety, because it generally discourages hirer involvement in contracted work. This is preferable because we presume the contractor is best situated to prevent contract worker injury given its relative proximity to the work, superior expertise and resources, ability to internalize costs, and relationship with the workers. (See *Hooker*, *supra*, 27 Cal.4th at p. 213; Rest.3d Torts, *supra*, § 57, com. c, p. 392.) At the same time, the rule incentivizes the hirer to use reasonable care when the hirer does get involved. (See *Hooker*, at p. 213.) Second, the rule distributes liability equitably as between the hirer and the contractor. Where the hirer's contribution to an injury is merely derivative of the contractor's, it seems unfair to subject the hirer to tort liability while workers' compensation shields the contractor — not so where the hirer induces or independently contributes to the injury. (See *Hooker*, at pp. 204, 210–214; *Toland*, *supra*, 18 Cal.4th at p. 267; *Privette*, *supra*, 5 Cal.4th at p. 701; see also Rest.3d Torts, § 57, com. c, p. 392.) Finally, *Hooker*'s rule tends to strike an appropriate balance between victim compensation and socially undesirable hirer burdens, avoiding a tort scheme that might lead hirers to impose inappropriate safety requirements (see Rest.3d Torts, § 56, com. b, pp. 390–392) or avoid assigning dangerous jobs to those with the necessary expertise (see *Privette*, at p. 700).

### 2.

In this case, substantial evidence does not support the conclusion that Qualcomm both retained control over some part of TransPower's work and actually exercised that control in a manner that affirmatively contributed to Sandoval's injury. Sandoval's arguments implicate four distinct theories regarding how the evidence establishes these elements. Two of these theories fall short of establishing retained control. The third

fails for lack of an actual exercise of retained control. And the fourth lacks any showing of affirmative contribution. We address each in turn.

Contrary to Sandoval's primary argument, Qualcomm did not owe him a retained control duty respecting the power-down process itself. Qualcomm's control over the power-down process was not "retained control" over contracted work, because the power-down process was not within the scope of work Qualcomm had entrusted to TransPower. True: Qualcomm directed TransPower to observe the power-down process. And it asked TransPower to confirm that TransPower was satisfied with Qualcomm's performance of the power-down process. Qualcomm nonetheless stopped short of offering — and TransPower never agreed — that TransPower take responsibility for actually performing the power-down process. Nor is it enough here that the power-down process was a necessary precondition for TransPower's work, or that both the power-down process and TransPower's work were essential components of a single larger job. Instead, Qualcomm's performance of the power-down process implicates a retained control duty only to the extent that performance actually resulted in retained control over the work Qualcomm did entrust to TransPower: the inspection of the main cogen circuit.[8]

---

[8] As we determined above, Qualcomm ceased performing the power-down process and turned over control of the worksite well before Sandoval's injury. This case does not present, and thus we do not address, the issue of a hirer performing noncontract work and the contractor performing contracted work *at the same time*. (See, e.g., *Tverberg II, supra*, 202

Although Qualcomm's performance of the power-down process arguably limited TransPower's own freedom to power down *additional* circuits during its inspection, Sandoval's *Hooker* claim on this basis still fails to establish that Qualcomm retained control. To wit: On the evidence here, Qualcomm did not retain control over the inspection of the main cogen circuit merely by keeping certain other circuits live. Qualcomm's creation of this condition at the worksite imposed too little a degree of control over TransPower's manner of performing the inspection. Even if Qualcomm could be said to have conveyed an expectation that TransPower perform its work in the presence of live circuits, TransPower was aware of and had ample freedom within the scope of its entrusted work to accommodate the presence of the live circuits effectively in its own manner, particularly since they were safely covered by bolted-on protective panels and not relevant to TransPower's inspection. Qualcomm did not retain control over the inspection merely by declining to shut down these circuits or to give TransPower the authority to do so. (See *Padilla, supra,* 166 Cal.App.4th at p. 671 [finding that hirer did not retain control by expecting contractor to work in presence of pressurized water pipe where hirer disclosed the pipe's condition and contractor had ample freedom to perform its work in its own manner without contacting the pressurized pipe].) It is not enough to say that the presence of live circuits pertained to "safety conditions at the worksite." Under the circumstances here, Qualcomm's control over what was and what was not

_____

Cal.App.4th at pp. 1442–1443 [hirer (through another subcontractor) performing bollard hole work at same time plaintiff contractor performed canopy construction work].)

powered down did not constitute retained control over the contracted work.

Qualcomm may have had authority — by virtue of performing the power-down process or otherwise — to require specific precautions during the inspection, but even if so, Qualcomm did not "actually exercise" that authority. Even assuming that Qualcomm retained control[9] by retaining the authority to require or provide such precautions — e.g., supervision, a personal warning for Sandoval, arc flash protection suits, barricades, and/or additional warning signage — TransPower remained entirely free to implement (or not) any of these precautions in its own manner, issues over which Qualcomm exerted no influence. Although Sandoval argues that Qualcomm's performance of the power-down process gave rise to a "duty" on Qualcomm's part to take these precautions, he does not argue — nor is there any indication in the evidence — that Qualcomm's performance of the power-down process induced TransPower's failure to take any of these precautions itself. Likewise, that Qualcomm may have previously supervised TransPower's work does not establish, in this case, that Qualcomm induced TransPower's reliance on Qualcomm supervision. Sharghi's uncontradicted testimony established that the reason TransPower did not request or wait for Qualcomm's supervision was that Sharghi felt "in charge," "knew what [he was] doing," and didn't "need" a monitor. That Qualcomm's employees may have been trained to provide

---

[9] Given this assumption, we decline to resolve whether the doctrines of waiver or invited error preclude Qualcomm from contesting that it retained control over at least some parts of the inspection.

personal warnings to everyone in the room, or that Qualcomm's managers and experts may have considered such warnings "critical," does not establish that Qualcomm induced TransPower's reliance on Qualcomm to provide them. (*Sandoval, supra,* 28 Cal.App.5th at p. 418.) Substantial evidence does not support the conclusion that Qualcomm actually exercised its retained control with regard to any of these precautions.

Qualcomm did take one critical precaution, though Sandoval contends it was insufficient: Qualcomm left the bolted-on protective covers over all of the live circuits. But even if Qualcomm could be said to have retained and actually exercised control over the inspection by implementing this precaution, there is no evidence that Qualcomm thereby "affirmatively contributed" to Sandoval's injury. Qualcomm's decision to leave bolted-on protective covers in place certainly did not induce TransPower's decision to open them. Nor does the evidence suggest that Qualcomm otherwise induced that decision by, for instance, misrepresenting to TransPower the live condition of the GF-5 circuit. Qualcomm merely failed to prevent TransPower from opening the back GF-5 panel. Substantial evidence thus does not support the conclusion that Qualcomm affirmatively contributed to Sandoval's injury through any exercise of control over the bolted-on protective panels.

In this situation, Qualcomm owed Sandoval no injury-prevention tort duty. By turning over control of the worksite, Qualcomm presumptively delegated to TransPower any preexisting duties Qualcomm otherwise owed Sandoval. As noted above, this case does not fall within the concealed hazards exception to *Privette*'s general bar to hirer liability. Nor does

any substantial evidence support application of the retained control exception. Qualcomm is therefore entitled to judgment notwithstanding the verdict.

## D.

Complex tort law concepts like the retained control exception to the *Privette* doctrine ultimately get explained to juries by way of standardized pattern jury instructions. This case raised the question of whether the CACI No. 1009B pattern jury instruction adequately instructs juries on the necessary elements of a *Hooker* claim. It does not.

The pattern version of CACI No. 1009B provides: "[*Name of plaintiff*] claims that [he/she/*nonbinary pronoun*] was harmed by an unsafe condition while employed by [*name of plaintiff's employer*] and working on [*name of defendant*]'s property. To establish this claim, [*name of plaintiff*] must prove all of the following: [¶] 1. That [*name of defendant*] [owned/leased/occupied/controlled] the property; [¶] 2. That [*name of defendant*] retained control over safety conditions at the worksite; [¶] 3. That [*name of defendant*] negligently exercised [his/her/*nonbinary pronoun*/its] retained control over safety conditions by [*specify alleged negligent acts or omissions*]; [¶] 4. That [*name of plaintiff*] was harmed; and [¶] 5. That [*name of defendant*]'s negligent exercise of [his/her/*nonbinary pronoun*/its] retained control over safety conditions was a substantial factor in causing [*name of plaintiff*]'s harm."[10]

---

[10]  The trial court in this case gave a modified version of the CACI No. 1009B instruction as follows: "Martin Sandoval claims that he was harmed by an unsafe condition while employed by ROS Electrical and working on Qualcomm's

We observe at the outset that the pattern instruction improperly mixes the *Privette* exceptions we recognized in *Kinsman* and *Hooker*. It does so by including as an element of the *Hooker* theory that the defendant owned or controlled the property on which the incident occurred. Although the concealed hazards exception we elucidated in *Kinsman* applied only to landowner-hirers, no such limit governs the retained control exception we recognized in *Hooker*.

To establish a duty under *Hooker*, a plaintiff must establish (1) that the hirer retained control over the manner of performance of some part of the work entrusted to the contractor; and (2) that the hirer actually exercised its retained control over that work in a way that affirmatively contributed to the plaintiff's injury. The CACI instruction need not replicate these exact words, but its instructions must be consistent with the meaning of these terms as we have clarified them in this opinion. Whether the hirer "retained control over safety conditions at the worksite" (CACI No. 1009B) does not properly capture whether the hirer retained control over the manner of performance of some part of the work entrusted to the contractor. Whether the hirer "negligently exercised [its] retained control over safety conditions" (*ibid.*) does not properly capture whether the hirer actually exercised its retained

property. To establish this claim, Martin Sandoval must prove all of the following: [¶] 1. That Qualcomm owned the property; [¶] 2. That Qualcomm retained control over safety conditions at the worksite; [¶] 3. That Qualcomm negligently exercised its retained control over safety conditions concerning the main co-gen cabinet inspection; [¶] 4. That Martin Sandoval was harmed; and [¶] 5. That Qualcomm's negligent exercise of its retained control over safety conditions was a substantial factor in causing Martin Sandoval's harm."

control. And whether the hirer's "negligent exercise of [its] retained control over safety conditions was a substantial factor in causing [plaintiff]'s harm" (*ibid.*) does not properly capture whether the hirer's exercise of retained control affirmatively contributed to the plaintiff's injury.[11] The Judicial Council and its Advisory Committee on Civil Jury Instructions should update this instruction with suitable language consistent with this opinion.

## III.

The plaintiff sustained atrocious injuries that could have been prevented. But a rule subjecting Qualcomm to tort liability merely for failing to prevent those injuries could easily lead to more, rather than fewer, injuries in future cases. For instance, making the hirer liable under the circumstances presented here might incentivize hirers to impose and enforce requirements on their contractors that — owing to the hirer's more limited expertise and experience — actually impede the contractor's ability to do the job safely. Or it might discourage hirers from engaging more expert contractors at all.

We retain here the balance struck in our past decisions recognizing a rule that hirers who fully and effectively delegate work to a contractor owe no tort duty to that contractor's workers. The same rule also provides that hirers may be liable for a failure to use reasonable care when they withhold critical information or actually exercise retained control in a way that affirmatively contributes to the injury. Applying this rule here,

---

[11] We leave it to the Judicial Council to determine how to convey the distinct negligence and causation elements of the cause of action, once it has revised the duty element in accordance with this opinion.

we conclude that Qualcomm owed Sandoval no tort duty.  We reverse the judgment of the Court of Appeal and remand with instructions to remand to the trial court to enter judgment for Qualcomm notwithstanding the verdict.


$$\text{CUÉLLAR, J.}$$


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**FEUER, J.***

---

\*      Associate Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Sandoval v. Qualcomm Incorporated

---

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 28 Cal.App.5th 381
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S252796
**Date Filed:** September 9, 2021

---

**Court:** Superior
**County:** San Diego
**Judge:** Joan Marie Lewis

---

**Counsel:**

Thon Beck Vanni Callahan & Powell, Daniel P. Powell, Michael P. O'Connor; Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Appellant.

Alan Charles Dell'Ario for Consumer Attorneys of California as Amicus Curaie on behalf of Plaintiff and Appellant.

Horvitz & Levy, Stephen E. Norris, Jason R. Litt, Joshua C. McDaniel; Wingert Grebing Brubaker & Juskie, Alan K. Brubaker and Colin H. Walshok for Defendant and Appellant.

California Appellate Law Group, Katy Graham, Greg Wolff; U.S. Chamber Litigation Center and Janet Galeria for the Chamber of Commerce of the United States, the American Property Casualty Insurance Association and the Civil Justice Association of California as Amici Curiae on behalf of Defendant and Appellant.

Lewis Brisbois Bisgaard & Smith, Lann G. McIntyre and Andrew D. Bluth for Western States Petroleum Association as Amicus Curiae on behalf of Defendant and Appellant.

June Babiracki Barlow and Neil Kalin for California Association of Realtors as Amicus Curiae on behalf of Defendant and Appellant.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Joshua C. McDaniel
Horvitz & Levy LLP
3601 W. Olive Ave., 8th Floor
Burbank, CA 91505
(818) 995-0800

Stuart B. Esner
Esner, Chang & Boyer
234 E. Colorado Blvd., Suite 975
Pasadena, CA 91101
(626) 535-9860

Daniel P. Powell
Thon Beck Vanni Callahan & Powell
1100 E. Green St.
Pasadena, CA 91106
(626) 795-8333